STATE OF CONNECTICUT *v.* RICARDO ETIENNE
(AC 27500)

Schaller, DiPentima and Gruendel, Js.

Argued April 19—officially released September 4, 2007

*Mark Diamond,* special public defender, for the appellant (defendant).

*Kathryn Ward Bare,* special deputy assistant state's attorney, with whom, on the brief, were *David I. Cohen,* state's attorney, and *Kelley P. Swift,* former assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Ricardo Etienne, appeals from the judgment of conviction, rendered after a court trial, of forgery in the second degree in violation of General Statutes § 53a-139 (a) (3)[1] and possession of narcotics in violation of General Statutes § 21a-279 (c).[2] On appeal, the defendant claims that the court improperly denied his motion to suppress. He also alleges evidential insufficiency and error.[3] We affirm the judgment of the trial court.

---

[1] General Statutes § 53a-139 (a) provides in relevant part: "A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed . . . (3) a written instrument officially issued or created by a public office, public servant or governmental instrumentality . . . ."

[2] General Statutes § 21a-279 (c) provides in relevant part: "Any person . . . who possesses or has under his control less than four ounces of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be fined not more than one thousand dollars or be imprisoned not more than one year, or be both fined and imprisoned; and for a subsequent offense, may be fined not more than three thousand dollars or be imprisoned not more than five years, or be both fined and imprisoned."

[3] The defendant also claims that the court issued an illegal sentence. At the sentencing hearing, the court sentenced the defendant to a term of thirty-nine months incarceration, the legality of which the defendant concedes. The

The court reasonably could have found the following facts. On the evening of April 29, 2003, officers from the Stamford police department conducted surveillance at Cove Island Park as part of a narcotics investigation. The surveillance involved two unmarked vehicles that each contained two plainclothes officers. One vehicle was stationed in the parking lot; the other was parked a short distance away and served as a "takedown team." At 9:30 p.m., a red Volkswagen entered the parking lot and stopped approximately thirty feet in front of the unmarked police vehicle. The defendant sat in the rear passenger seat while his brother, Alain Etienne, and a female friend sat in the driver's and front passenger seats, respectively. The officers watched as the defendant reached out of the rear passenger window and dumped the contents of a cigar to the ground. A moment later, they saw him light the cigar. When the officers detected the odor of marijuana, they notified the takedown team.

The takedown team smelled the odor of marijuana as they approached the Volkswagen. Upon removing the defendant from the vehicle, Officer James Matheny recognized the defendant from a prior arrest. Matheny then entered the vehicle. Officer Christopher Broems asked the defendant his name, to which he replied, "Alain Etienne." The driver of the vehicle also identified himself as Alain Etienne and informed the officers that the defendant was his brother, Ricardo Etienne. Inside

court later misspoke and indicated that his term totaled three and one-half years. The judgment file expressly states that "[o]n July 18, 2005, the following sentence was imposed by Judge Wilson who presided over the trial: Count [one], the defendant was sentenced to [thirty-nine] months to serve; [Count two] the defendant was sentenced to unconditional discharge." The judgment mittimus, of which we are entitled to take judicial notice; *Grant* v. *Commissioner of Correction*, 87 Conn. App. 814, 817, 867 A.2d 145, cert. denied, 274 Conn. 918, 879 A.2d 895 (2005); likewise reflects that the defendant received a sentence of thirty-nine months. That claim, therefore, lacks merit.

the Volkswagen, Matheny discovered a "partially smoked marijuana cigarette" on the rear passenger floor where the defendant earlier sat. Accordingly, the officers handcuffed the defendant and placed him under arrest. Broems then inquired as to whether the defendant had any identification, to which the defendant answered affirmatively. Retrieving a wallet from the defendant's pocket, the officers found a Florida identification card and a social security card that both bore the name "Alain Etienne." The photograph on the identification card was one of the defendant.

The officers transported the defendant to police headquarters. Officer Brian Butler completed a uniform arrest report by asking the defendant a series of biographical questions, including one regarding his identity. During booking, the officers also asked the defendant to remove his shoes. When he complied, the officers found a marijuana cigarette in the defendant's shoe. Laboratory tests later confirmed that both the cigarette found in the Volkswagen and the cigarette found in the shoe contained marijuana. In addition, fingerprints of the defendant taken during booking matched those obtained from Ricardo Etienne in connection with a 1997 arrest.[4]

Also, at some point while at police headquarters that evening, Matheny heard the defendant volunteer that "he was Ricardo Etienne and that he had reentered the country through Orlando, Florida."[5] Subsequent contact with the Immigration and Naturalization Service confirmed that the defendant had been deported in 2000.

The defendant was charged by information with one count of possession of marijuana and one count of

[4] At trial, counsel for the defendant stipulated that both sets of fingerprints were those of the defendant.

[5] The record is unclear as to precisely when the defendant made that statement at police headquarters and whether it preceded his statement to Butler.

forgery in the second degree. He thereafter filed a motion to suppress his statements made to the officers on April 29, 2003. Following a hearing on the matter, the court denied the motion.[6] Prior to trial, the state filed a motion in limine in which it requested that the court take judicial notice of "[Fla. Stat. Ann. §§ 322.02 and 322.051 et seq. (West 2005)], which authorize the [Florida] [d]epartment of [h]ighway [s]afety and [m]otor vehicles to issue Florida identification cards, which are officially issued or created by this public office, its public servants and government instrumentality." The state also filed a motion in limine by which it provided notice that it may introduce certain prior uncharged misconduct of the defendant, namely, evidence that on August 14, 2000, the United States District Court ordered that he be deported to Haiti. The court granted both motions and a trial followed, at the conclusion of which the court found the defendant guilty on both counts. The court rendered judgment and sentenced the defendant to a total effective term of thirty-nine months imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

In the seminal case of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that when a suspect is subjected to custodial interrogation, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning

---

[6] Although the court found that the defendant was not provided warnings pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), until after he was booked, it nevertheless concluded that no custodial interrogation occurred.

if he so desires.'"[7] Id., 479. The defendant claims that because he was not provided *Miranda* warnings prior to stating his name either at the parking lot or during booking at the police headquarters,[8] the court improperly denied his motion to suppress.

Our standard of review of the court's findings and conclusions in connection with a motion to suppress is well established. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 514, 903 A.2d 169 (2006).

The fifth amendment to the United States constitution affords to each individual the privilege not to be compelled to incriminate himself or herself.[9] "The fundamental purpose of the Court's decision in *Miranda* was

[7] "*Miranda* has become embedded in routine police practice to the point where warnings have become part of our natural culture." *Dickerson* v. *United States*, 530 U.S. 428, 443, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

[8] In addition to his statements at the parking lot and during booking, the defendant challenges the admission of his statement to Matheny at police headquarters that "he was Ricardo Etienne and that he had reentered the country through Orlando, Florida." The record reveals that this particular statement was not in response to any question from any member of the Stamford police department, but rather was voluntarily uttered as the defendant awaited processing. Specifically, the court heard testimony from Matheny that "I was just standing in the booking area watching him get processed" when the defendant made that declaration. Matheny and other officers offered uncontradicted testimony that they did not ask the defendant any questions to elicit that information. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda* v. *Arizona*, supra, 384 U.S. 478.

[9] The fifth amendment provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process. . . . To this end, the *Miranda* Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights from the government compulsion, subtle or otherwise, that operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Citations omitted; internal quotation marks omitted.) *Connecticut* v. *Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920, on remand, 205 Conn. 437, 534 A.2d 219 (1987). The *Miranda* court explained that its prophylactic rules were intended to guard against "overzealous police practices"; *Miranda* v. *Arizona*, supra, 384 U.S. 444; and the fact that "custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." Id., 455. The United States Supreme Court subsequently has observed that "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer* v. *McCarty*, 468 U.S. 420, 437, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

*Miranda* mandates that the warnings it articulated must be given "when the individual is first subjected to police interrogation while in custody . . . ." *Miranda* v. *Arizona*, supra, 384 U.S. 477. "[T]he term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Emphasis in original; internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 398,

Although the defendant alleges a violation under both the federal and state constitutions, he has failed to analyze separately his state constitutional claim. Therefore, we consider only his federal claim. See *State* v. *Rizzo*, 266 Conn. 171, 290 n.69, 833 A.2d 363 (2003).

908 A.2d 506 (2006), quoting *Rhode Island* v. *Innis*, 446 U.S. 291, 300–301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). "Routine questions . . . ordinarily innocent of any investigative purpose, do not pose the dangers *Miranda* was designed to check . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, 37 Conn. App. 437, 445, 656 A.2d 696, cert. denied, 233 Conn. 915, 659 A.2d 186 (1995). Regarding the defendant's statement at the parking lot, the record reveals that immediately after the defendant was removed from the Volkswagen, Matheny entered the vehicle. At that moment, Broems asked the defendant his name, and the defendant replied, "Alain Etienne." When that question was posed, neither the narcotics nor the identification cards had been discovered. Further, the defendant had not yet been handcuffed or arrested. In light of the foregoing, that simple inquiry by the officer first encountering the defendant cannot be described as a coercive or overzealous police practice. It certainly was not a custodial interrogation pursuant to *Miranda*. See *State* v. *Canales*, 281 Conn. 572, 586, 916 A.2d 767 (2007); *State* v. *Walters*, 94 Conn. App. 297, 304, 891 A.2d 1003, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006).

More problematic is the defendant's statement made during booking. The following additional facts are necessary. At police headquarters on the evening of April 29, 2003, Butler completed a uniform arrest report, which is standard protocol during the booking process. The uniform arrest report contains boxes in which the preparer indicates, inter alia, the name of the accused, the address of the accused, the sex, race, height, weight, hair and eye color of the accused, and the date and place of birth of the accused. Butler testified that he asked the defendant biographical questions in order to complete the uniform arrest report, which the defendant answered. Butler further testified that he asked the defendant no additional questions.

Questions asked by the police during booking of a criminal suspect qualify as custodial interrogation. *State* v. *Jones*, supra, 37 Conn. App. 444. Conceding that point, the state nevertheless contends that the routine booking question exception to the requirement of *Miranda* warnings recognized by the United States Supreme Court in *Pennsylvania* v. *Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990), applies in the present case. "The [routine booking question] exception encompasses questions that secure biographical data necessary to complete booking or pretrial services. . . . The court acknowledged that the questions qualify as custodial interrogation but held that questions such as name, address, height, weight, eye color, date of birth, and age fall outside the sweep of *Miranda* v. *Arizona*, [supra, 384 U.S. 436]. . . . The exception does not arise, however, if the questions are reasonably likely to elicit an incriminating response in a particular situation." (Citations omitted; internal quotation marks omitted.) *State* v. *Cuesta*, 68 Conn. App. 470, 478, 791 A.2d 686, cert. denied, 260 Conn. 914, 796 A.2d 559 (2002).

The defendant claims that although the question as to his identity was a routine one, the officers knew that he had earlier identified himself as Alain Etienne and possessed a Florida identification card in that name. He therefore maintains that the question was reasonably likely to elicit an incriminating response. We agree.

"The test as to whether a particular question is likely to elicit an incriminating response is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime is highly relevant. . . . Ordinarily, the routine gathering of background, biographical data will not constitute interrogation. . . . We are aware, however, that [a] person's name, age, address, marital status and

similar data, while usually non-incriminatory in character, may in a particular context provide the missing link required to convict. . . . [W]e recognize the potential for abuse by law enforcement officers who might, under the guise of seeking objective or neutral information, deliberately elicit an incriminating statement from a suspect. . . . A balance must be struck between information legitimately required by law enforcement to facilitate booking . . . and the protection of a defendant's constitutional rights." (Citations omitted; internal quotation marks omitted.) *State* v. *Evans*, 203 Conn. 212, 226–27, 523 A.2d 1306 (1987).

Our analysis is aided by this court's decision in *State* v. *Jones*, supra, 37 Conn. App. 437, in which the defendant raised a similar claim concerning a booking question as to his identity. In holding that the routine booking exception enunciated in *Pennsylvania* v. *Muniz*, supra, 496 U.S. 601, applied, we stated that "[t]he situation in this case was unlike that in *United States* v. *Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983), in which the questions asked related directly to an element of a crime that . . . [the investigator] had reason to suspect. [T]he defendant's true name was not in itself incriminatory. The defendant's name did not connect him to the assault, nor was it an element of the assault." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 445. Likewise, the defendant in *Commonwealth* v. *Ramirez*, 55 Mass. App. 224, 770 N.E.2d 30, review denied, 437 Mass. 1108, 774 N.E.2d 1099 (2002), was asked his name at the time of his arrest, to which he responded falsely. Id., 226. On appeal, the defendant claimed that the trial court improperly denied his motion to suppress that statement, arguing that "because the police knew he had given a false name on a previous occasion, they may well have intended to elicit a false response on the occasion of his arrest."

Id. The Massachusetts Appeals Court disagreed: "Standing alone, the fact that the questioning officer knew that the defendant had given a false name once before does not support a conclusion that the officer expected him to do so again, and asked the defendant his name for the purpose of using the false name to incriminate him." Id. Echoing the holding of this court in *Jones*, the court in *Ramirez* emphasized that "the defendant's response of a false name . . . is not directly linked to the charged offense." Id., 227.

The uniform arrest report completed by Butler on the evening of April 29, 2003, contained a box labeled "charge(s) and statute number." In that box, Butler wrote "possession marijuana 21a-279 (c)" and "forgery second 53a-139." Plainly, then, the police were pursuing the forgery charge at the time the defendant was asked the booking questions.[10] The defendant's true identity related directly to that crime. To convict the defendant of forgery in the second degree, the state was required to prove that he either falsely made, completed or altered a written instrument or possessed a written instrument that he knew to be forged. See footnote 1. The written instrument in question was the Florida identification card that contained the defendant's photograph and bore the name "Alain Etienne." Whether the defendant was not, in fact, Alain Etienne thus was directly linked to the charged offense. Consequently, when Butler asked the defendant his name, that inquiry was reasonably likely to elicit an incriminating response. See also *United States* v. *Disla*, 805 F.2d 1340, 1347 (9th Cir. 1986) (question as to where defendant lived related to element of crime police suspected

---

[10] The defendant's uniform arrest report on its face belies the state's contention that the forgery charge "may not even have existed at the time the questions were asked." In addition, Matheny testified that he "positively recognized" the defendant and, further, that he stated that fact "at the scene" and "in the jail." That testimony confirms that the defendant's actual identity was at issue prior to Butler's questioning.

defendant committed); *State* v. *Stevens*, 173 Wis. 2d 290, 302, 496 N.W.2d 201 (Wis. App. 1992) (questions concerning defendant's identity and residence constituted interrogation because they related to element of crime under investigation), rev'd in part on other grounds, 181 Wis. 2d 410, 511 N.W.2d 591 (1994), cert. denied, 515 U.S. 1102, 115 S. Ct. 2245, 132 L. Ed. 2d 254 (1995). We therefore conclude that the defendant's answer does not fall within the routine booking question exception.[11] The defendant's fifth amendment right against self-incrimination demanded that he receive *Miranda* warnings prior to that inquiry.

That conclusion does not end our analysis of the defendant's claim. The state argues that the admission of the defendant's statement was harmless. "The improper admission of a confession is harmless error [when] it can be said beyond a reasonable doubt that the confession did not contribute to the conviction." *State* v. *Hafford*, 252 Conn. 274, 297, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). In the present case, the defendant stipulated at trial that the fingerprints taken from him on April 29, 2003, matched those of Ricardo Etienne taken in connection with a 1997 arrest. Moreover, during his testimony, Alain Etienne identified the defendant as Ricardo Etienne. Finally, while at police headquarters and apart from Butler's biographical questions, the defendant volunteered that he was Ricardo Etienne. See footnote

---

[11] The concurrence concludes that the booking question as to the defendant's name was a neutral one directed toward ascertaining the defendant's true name for booking purposes. The fact that Matheny informed his fellow officers at police headquarters that he knew the defendant was Ricardo Etienne, and not Alain Etienne as the identification card averred, casts doubt as to whether Butler's question was, in fact, neutral. Coupled with the fact that Butler knew the defendant was being charged with forgery in the second degree in violation of General Statutes § 53a-139, as evinced by the uniform arrest report he completed, it is plausible that, under the guise of seeking objective or neutral information, Butler attempted to elicit an incriminating statement.

8. Under those circumstances, any impropriety in the state's use of the challenged statement was harmless beyond a reasonable doubt.

II

The defendant's second claim is that the evidence was not sufficient to prove that the Florida identification card was a forged instrument. As a result, he contends that the court improperly denied his motion for a judgment of acquittal. We do not agree.

"In reviewing claims of insufficiency, we first review the evidence presented at trial and construe it in the light most favorable to sustaining the trial court's finding of guilt. . . . We then look at the facts established at trial and the reasonable inferences drawn from those facts and decide whether the court could have reasonably concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . . Our standard in reviewing the conclusions of the trier of fact is limited. . . . We will construe the evidence in the light most favorable to sustaining the trial court's judgment and will affirm the court's conclusions if reasonably supported by the evidence and logical inferences drawn therefrom. . . . The question on appeal is not whether we believe that the evidence established guilt beyond a reasonable doubt, but rather whether, after viewing the evidence in the light most favorable to sustaining the judgment, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We give deference to the unique opportunity of the trier of fact to observe the conduct, demeanor and attitude of the trial witnesses and to assess their credibility. . . . The trial court's findings of fact are entitled to great weight . . . but those findings are not conclusive." (Internal quotation marks omitted.) *State* v.

*Jones,* 99 Conn. App. 196, 200, 912 A.2d 1099, cert. denied, 281 Conn. 927, 918 A.2d 279 (2007).

For the defendant to be found guilty of violating § 53a-139, the state must prove that "(1) the defendant intended to deceive another and (2) that he possessed a written instrument that he knew to be forged." *State v. Henderson,* 47 Conn. App. 542, 551, 706 A.2d 480, cert. denied, 244 Conn. 908, 713 A.2d 829 (1998). Prior to trial, the state filed a motion in limine in which it requested that the court take judicial notice of "[Fla. Stat. Ann. §§ 322.02 and 322.051 et seq. (West 2005)], which authorize the [Florida] [d]epartment of [h]ighway [s]afety and [m]otor vehicles to issue Florida identification cards, which are officially issued or created by this public office, its public servants and government instrumentality." The court granted that motion. At trial, the court heard the testimony of Matheny that the defendant identified himself at the parking lot as Alain Etienne. Furthermore, when Matheny informed the defendant that he knew the defendant was Ricardo Etienne, the defendant stated that "he had an identification card that said he was Alain Etienne." The state presented evidence, in the form of fingerprints and the testimony of Alain Etienne, which confirmed that the defendant was, in fact, Ricardo Etienne. That court also heard testimony that the identification card was found in the defendant's wallet in his pocket on the night of April 29, 2003.

The identification card was introduced into evidence as an exhibit. That instrument was labeled "Florida identification card" and bore both an image of the state of Florida and the caption "The Sunshine State."[12] It

---

[12] The back of the instrument contained "driver license restriction codes" and "learners license" conditions in small print. It further contained the following text: "Fred O. Dickinson III, Executive Director, Department of Highway Safety and Motor Vehicles, Sandra C. Lambert, Director, Division of Driver Licenses," and stated: "The state of Florida retains all property rights herein. DL38."

was in the name of Alain Etienne and contained a photograph and signature. At trial, Alain Etienne testified that he had never visited Florida nor had he ever applied for a Florida identification card. He further testified that the identification card contained his name and date of birth, and he identified the person depicted in the photograph on the identification card as the defendant. Although the signature on the identification card read "Alain Etienne," he testified that he did not sign that card. Rather, he testified that he recognized the handwriting as that of the defendant. Construing the evidence in the light most favorable to sustaining the conviction, we determine that the court reasonably could have concluded beyond a reasonable doubt that the defendant was guilty of forgery in the second degree.

III

The defendant's final claim on appeal is that the court abused its discretion in admitting evidence of the defendant's prior deportation. The following facts are relevant to that claim. Prior to trial, the state also filed a motion in limine by which it provided notice that it may introduce certain prior uncharged misconduct of the defendant, namely, evidence that on August 14, 2000, the United States District Court ordered that the defendant be deported to Haiti. The court held a hearing on the matter, at the conclusion of which it granted the motion. The court expressly considered the probative value and prejudicial effect of that evidence and found that "the fact that [the defendant] was deported on August 14, 2000, goes to the defendant's motive in this case." At trial, counsel for the defendant objected to a question the prosecutor asked concerning the defendant's deportation. The prosecutor submitted that the question related to motive, and the court agreed, overruling the objection. Matheny then testified that the defendant "had been deported from this country in 2000."

"The rules governing the admissibility of evidence of a criminal defendant's prior misconduct are well established. Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 343, 904 A.2d 101 (2006).

We agree with the court that the fact that the defendant had been deported was relevant to the issues of whether he possessed a written instrument that he knew to be forged and whether, by such possession, he intended to deceive another. The fact that the defendant was not legally in this country certainly is relevant to the question of whether he was motivated to possess an identification card in another's name. It also informs his statement to the police in the parking lot that he was Alain Etienne and had identification so indicating. Indulging every presumption in favor of the correctness of the court's ruling, we cannot say that the court abused its discretion in admitting evidence of the defendant's deportation.

The judgment is affirmed.

In this opinion DiPENTIMA, J., concurred.

SCHALLER, J., concurring. Although I concur in the result reached by the majority, I respectfully disagree with the analysis of the claim with regard to the motion to suppress. Specifically, I do not agree that the defendant, Ricardo Etienne, was entitled to *Miranda*[1] warnings prior to being asked his name during the booking process at police headquarters. The majority concludes that "[t]he defendant's fifth amendment right against self-incrimination demanded that he receive *Miranda* warnings prior to that inquiry." The majority reasons that the question as to the defendant's name did not fall within the routine booking question exception to *Miranda* because it was "reasonably likely to elicit an incriminating response." The majority goes on to conclude that the admission of his statement, that is, his name, was harmless in view of fingerprint evidence, the identification of the defendant at trial by his brother, Alain Etienne, and the fact that the defendant volunteered his name apart from the booking process. In my view, the defendant's name was not incriminating information that would cause the inquiry as to his name to fall outside the scope of the booking exception.

I begin by setting forth several aspects of the procedural and factual history pertaining to this case. Prior to trial, the defendant filed a motion to suppress all written and oral statements that he had made. Following a hearing, the court denied the motion, concluding in part that "[t]here was no evidence that questioning, other than routine booking and processing questions, took place at the [police] station. Routine booking questions . . . essentially administrative in nature and objectively neutral, are not custodial [interrogations] likely to elicit incriminating responses . . . ." (Citation

---

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

omitted.) In this appeal, the defendant challenged the booking question as to his name, arguing that "[t]he questions posed to [the defendant] were intended to make him divulge his true name. Since [the defendant's] true identity was critical to the charge of forgery, [the] police questioning constituted an interrogation, which should not have been performed before *Miranda* warnings were provided." The majority relies on similar reasoning in reaching its conclusion. Specifically, the majority explains its result as follows: "[T]he police were pursuing the forgery charge at the time the defendant was asked the booking questions. The defendant's true identity related directly to that crime. . . . Whether the defendant was not, in fact, Alain Etienne thus was directly linked to the charged offense. Consequently, when [Officer Brian] Butler asked the defendant his name, that inquiry was reasonably likely to elicit an incriminating response." (Citation omitted.) I respectfully disagree.

As an initial matter, I do not believe that a person's true name, by its very nature, is incriminating. First, an individual's true name is intrinsic to that person; it is information that is immutably linked to personal identity. It necessarily follows that, in the present case, it was not the defendant's true name or his true identity that was incriminating in any sense, but rather his actions in falsifying his name and identity. See *California v. Byers*, 402 U.S. 424, 434, 91 S. Ct. 1535, 29 L. Ed. 2d 9 (1971) ("[a name] identifies but does not by itself implicate anyone in criminal conduct").

Second, in addition to the intrinsically neutral quality of a name, it is also beyond question that ascertaining an individual's name and, with it, his identity, is a crucial part of police procedure and criminal prosecution. As a result, in my view, questioning an individual about his name falls squarely within the booking exception enunciated by the United States Supreme Court in

*Pennsylvania* v. *Muniz*, 496 U.S. 582, 601–602, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990), encompassing questions necessary to secure "biographical data necessary to complete booking or pretrial services." (Internal quotation marks omitted.) Id., 601. It is fundamental that police must know the identity of the individual who is being held and who is to be charged. The police are obligated to know that they have the correct individual in custody. See *United States* v. *Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) ("Police often know the names of suspects they intend to apprehend . . . . As a cautionary measure, police usually prudently inquire as to the suspect's name to ensure that the wrong person is not apprehended."). Indeed, other jurisdictions have recognized the impracticality of requiring police to provide *Miranda* warnings prior to questioning an individual as to his name. See *State* v. *Landrum*, 112 Ariz. 555, 559, 544 P.2d 664 (1976) (law enforcement officer may question individual as to his name after detention but prior to issuing *Miranda* warnings); *People* v. *Alleyne*, 34 App. Div. 3d 367, 368, 828 N.Y.S.2d 2 (2006) ("[t]o carry [the] defendant's argument to its logical conclusion [that a booking question as to his nickname was improper], an officer who was aware that an arrestee's true name could link him to a crime could not even ask that elementary question during routine booking without first providing *Miranda* warnings"), leave to appeal denied, 8 N.Y.3d 918, 866 N.E.2d 455, 834 N.Y.S.2d 509 (2007). Furthermore, the name and the identity of the accused is essential to any prosecution. In this regard, the United States Court of Appeals for the Second Circuit has remarked that "a suspect who refuses to furnish his name or address may be ordered by the court to furnish information that will facilitate his identification, such as fingerprints . . . photographs . . . handwriting exemplars . . . blood samples . . . or similar identifying data . . . . Although

the data thus obtained may be distinguished from information as to identity furnished orally on the ground that the latter is testimonial in character, the line of demarcation is thin." (Citations omitted.) *United States ex rel. Hines* v. *LaValle*, 521 F.2d 1109, 1112 (2d Cir. 1975), cert. denied sub nom. *Hines* v. *Bombard*, 423 U.S. 1090, 96 S. Ct. 884, 47 L. Ed. 2d 101 (1976).

I recognize that the booking question exception does not apply to booking questions reasonably likely to elicit incriminating responses. *State* v. *Cuesta*, 68 Conn. App. 470, 477–78, 791 A.2d 686, cert. denied, 260 Conn. 914, 796 A.2d 559 (2002); see also *Rhode Island* v. *Innis*, 446 U.S. 291, 300–301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).[2] The majority concludes that the question as to the defendant's name was reasonably likely to elicit an incriminating response because the defendant's true identity related directly to the charge of forgery, which the police were pursuing at the time the question was posed. I cannot agree with this reasoning because, in my view, the defendant's true name and, therefore, his identity was not an element of the criminal charge. It was not the defendant's true name or identity that was incriminating but the fact that, under the circumstances, he misrepresented his identity as Alain Etienne. The police recovered two documents from the defendant, one purporting to be a Florida identification card and the other purporting to be a social security card, both bearing the name and signature of Alain Etienne. The identification card, however, displayed the defendant's

---

[2] In *Pennsylvania* v. *Muniz*, supra, 496 U.S. 602 n.14, the United States Supreme Court qualified the booking exception by stating that "the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." Although this court has examined routine booking questions under the standard set forth in *Rhode Island* v. *Innis*, supra, 446 U.S. 300–301, I note that the evidence in this case establishes that the question as to the defendant's name was certainly not "designed" to elicit an incriminating response, but rather was simply part of standard booking procedure.

photograph. Furthermore, at the site of the arrest, the defendant was identified as Ricardo Etienne by both Sergeant James Matheny and the defendant's brother. That information gave the police a basis for charging the defendant with forgery in the second degree, namely, that the defendant possessed written instruments that he knew to be forged and that purported to be officially issued by a public office. General Statutes § 53a-139 (a) (3). I refer to the evidence obtained at the site of the defendant's arrest for the sole purpose of illustrating that the incriminating information in this case was the defendant's falsification of his identity. I am not suggesting that the possession of this evidence, in any way, would allow the police to seek a subsequent incriminating response from the defendant.

For these reasons, this is not a case in which a booking question provided the police with a "missing link" of incriminating information necessary to pursue the forgery charge against the defendant. See *State* v. *Evans*, 203 Conn. 212, 226, 523 A.2d 1306 (1987). In view of the identifications at the scene by the defendant's brother and Matheny, the booking question at headquarters served the purpose of perfunctorily recording the defendant's actual name, which was already known. In asking the defendant his name according to the first question listed on the uniform arrest report, the officer followed standard booking procedure. See *State* v. *Cuesta*, supra, 68 Conn. App. 479 (fact that question as to place of birth posed in context of filling out uniform arrest report supported conclusion that police only were gathering ordinary information for administrative purposes).

Because the question as to the defendant's name was necessary only for booking purposes and was not reasonably likely to elicit an incriminating response, prior

*Miranda* warnings were not necessary under the booking exception. I therefore conclude that the trial court properly denied the defendant's motion to suppress.[3]

For the foregoing reasons, I respectfully concur with the majority's result affirming the judgment of the trial court.

---

[3] Although I need not reach the issue of whether the admission of the defendant's statement constituted harmless error, I agree with the majority's analysis.