484 P.3d 159
Vincent Joseph COMPOS, Petitioner,
v.The PEOPLE of the State of Colorado, Respondent.
Supreme Court Case No. 20SC143 Supreme Court of Colorado.
April 12, 2021
Attorneys for Petitioner: Megan A. Ring, Public Defender, Julia Chamberlin, Deputy Public Defender, Denver, Colorado
Attorneys for Respondent: Philip J. Weiser, Attorney General, Rebecca A. Adams, Senior Assistant Attorney General, Denver, Colorado
En Banc
JUSTICE GABRIEL delivered the Opinion of the Court.
¶1 This case presents two questions for our review. First, we must decide whether Vincent Compos's Miranda rights were violated when, after taking him into custody but prior to providing him with Miranda warnings, the police asked him his name. Second, we are asked to decide whether the division below erred in establishing a "new crime exception" to Miranda v. Arizona, 384 U.S. 436, 444, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and applying it here.1 ¶2 We now conclude that the question as to Compos's name amounted to a custodial interrogation, but, on the facts presented here, Compos's response was admissible at trial because the question was akin to the type of routine booking question that has been deemed to be excepted from Miranda's reach. For this reason, we affirm the judgment of the division below, albeit on other grounds, and in light of our determination, we need not consider and thus vacate the portion of the division's judgment establishing, sua sponte, a new crime exception to Miranda.
I. Facts and Procedural History
¶3 Compos and his ex-girlfriend dated for a few weeks before she decided to end the relationship. At about that time, the ex-girlfriend obtained a protection order that, among other things, prohibited Compos from contacting her.
¶4 Shortly after the relationship ended, Compos appeared at a Super Bowl party that the ex-girlfriend and her children were also attending. As a result, the ex-girlfriend left the party early and returned home with her children.
¶5 Later that evening, Compos arrived uninvited at the ex-girlfriend's home and let himself inside. The two began arguing, and during this argument, Compos threatened to kill the ex-girlfriend and her family. Compos then pulled out a gun and pointed it at the ex-girlfriend and her son.
¶6 At this point, the ex-girlfriend grabbed her phone, called 911, and then got her children and fled the house, not waiting for the police to arrive. In the course of her 911 call, the ex-girlfriend told the police that Compos was at her house and that he was not supposed to be there.
¶7 Within minutes after leaving her house, the ex-girlfriend was pulled over by police officers who had seen her vehicle leave the home. After explaining who she was and what had happened, she gave the police permission to go to her house, and she gave them her keys.
¶8 While the police were speaking with the ex-girlfriend, other officers arrived at her home and saw Compos inside at the bottom of the stairs leading to the back door where the officers were standing. The officers ordered Compos to come up the stairs, and Compos started to comply, but he then stopped and yelled at the officers that he had a gun and that they were going to have to shoot him. At that point, one of the officers tased Compos and incapacitated him. The officers then handcuffed Compos and took him into custody.
¶9 Approximately five minutes later, one of the officers spoke with Compos outside a patrol car. The officer asked Compos his name, to which Compos falsely responded "John Rocha" and provided a birthdate. Although the officer was aware of at least one protection order restricting Compos's activities, and although the officer also knew that Compos was on bond, he did not provide Miranda warnings before asking Compos his name.
¶10 As pertinent here, prosecutors thereafter charged Compos with criminal impersonation (based on his false statement that his name was "John Rocha") and with violating the protection order. Compos moved to suppress all of the statements that he had made in response to the police officer's questions (including the false statement regarding his name), arguing, among other things, that those statements were the products of a custodial interrogation conducted without the required Miranda warnings. Following a hearing, the trial court denied this motion, concluding that although Compos had been in custody, the question about his name was not designed to elicit an incriminating response and therefore did not violate Compos's Miranda rights.
¶11 The case proceeded to trial, and the jury ultimately convicted Compos of criminal impersonation and the lesser-included offense of false reporting. Thereafter, Compos pleaded guilty to the protection order violation count, which had been bifurcated; the parties reached a stipulation to resolve this case and several others pending against Compos; and the court sentenced Compos to a controlling term of three years in the Department of Corrections.
¶12 Compos then appealed, arguing, as pertinent here, that the trial court had erred in not suppressing his statement that his name was "John Rocha" because, in Compos's view, he had made this statement in the course of a custodial interrogation conducted without the benefit of the warnings required by Miranda , 384 U.S. at 444, 478-79, 86 S.Ct. 1602. The People countered that, notwithstanding the circumstances of the interrogation, the trial court had correctly treated the officer's inquiry as a non-investigative, administrative question covered by the so-called "routine booking question" exception to Miranda.
¶13 In a unanimous, published opinion, a division of the court of appeals determined that it did not need to resolve the dispute as framed by the parties. People v. Compos, 2019 COA 177, ¶ 15, ––– P.3d ––––. Instead, the division, acting sua sponte, concluded that "when an individual is interrogated in violation of Miranda, and his response to questioning is itself a crime [here, false reporting or criminal impersonation], the exclusionary rule will not bar admission of the response at any subsequent trial for charges based on the criminal act committed in the response." Id. at ¶ 26. The division thus adopted what has been called the "new crime exception" to the exclusionary rule, which this court has previously applied in the Fourth Amendment context but never in the context of an alleged Miranda violation. Id. at ¶¶ 18-19, 26 (citing People v. Doke, 171 P.3d 237, 239 (Colo. 2007) ).
¶14 Compos petitioned this court for a writ of certiorari, and we granted that petition.
II. Analysis
¶15 We begin by addressing the applicable standard of review. We then discuss Miranda's governing principles regarding custodial interrogations and the routine booking question exception, and we apply those principles to the facts presented here. Finally, we briefly address the division's adoption of a new crime exception to Miranda.
A. Standard of Review ¶16 When reviewing a suppression order, we defer to the trial court's factual findings if they are supported by competent evidence in the record. Verigan v. People, 2018 CO 53, ¶ 18, 420 P.3d 247, 250. We, however, review the trial court's legal conclusions de novo, and we will reverse such conclusions when the trial court applied an erroneous legal standard or came to a conclusion of constitutional law that was not supported by the factual findings. Id., 420 P.3d at 250-51.
B. Miranda and the Routine Booking Question Exception
¶17 The self-incrimination clause of the Fifth Amendment provides, "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda, 384 U.S. at 444, 86 S.Ct. 1602, the Supreme Court concluded that the protection of this privilege during custodial questioning requires the application of certain "procedural safeguards." Thus, the Court stated, "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. ¶18 Because the Miranda Court was primarily concerned that the "interrogation environment" created by the interplay of interrogation and custody could "subjugate the individual to the will of his examiner," id. at 457, 86 S.Ct. 1602, the above-noted procedural safeguards are not required unless a suspect is both in custody and subject to interrogation, People v. Davis, 2019 CO 84, ¶ 16, 449 P.3d 732, 737.
¶19 Here, all parties agree that Compos was in custody. Accordingly, we must decide whether the officer's inquiry as to Compos's name amounted to an interrogation.
¶20 In Pennsylvania v. Muniz, 496 U.S. 582, 600-02, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), the Supreme Court addressed this very question. There, the Commonwealth argued that a police officer's questions to the defendant regarding, among other things, his name and address did not constitute an interrogation within the meaning of Miranda . Id. at 600, 110 S.Ct. 2638. Five Justices of the Court, however, disagreed. See id. at 601, 110 S.Ct. 2638 (plurality opinion); id. at 608, 110 S.Ct. 2638 (Marshall, J., concurring in part and dissenting in part) (agreeing that a custodial interrogation had occurred).
¶21 In the Muniz plurality's view,
custodial interrogation for purposes of Miranda includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to "have ... the force of a question on the accused," and therefore be reasonably likely to elicit an incriminating response. Id. at 601, 110 S.Ct. 2638 (citation omitted) (quoting Harryman v. Estelle, 616 F.2d 870, 874 (5th Cir. 1980) ). Based on this standard, the plurality rejected the Commonwealth's contention that the questions at issue did not amount to a custodial interrogation. Id.
¶22 The plurality went on, however, to conclude that the defendant's answers to these questions were nonetheless admissible because those questions fell within the routine booking question exception to Miranda, which the plurality noted exempts from Miranda's coverage questions designed to obtain such biographical data as is necessary to complete booking or pretrial services. Id. ¶23 Although this court has not yet expressly adopted this exception, we now do so. The question remains, however, whether this exception should be limited to the context of an actual booking. Although we have not previously addressed this question, many other courts have done so and have declined to limit the exception's reach in this way. See, e.g., United States v. Brown, 101 F.3d 1272, 1274-75 (8th Cir. 1996) (concluding that the routine booking question exception applied in a case in which, at the time of the defendant's arrest, the defendant, without having been given Miranda warnings, provided a false name in response to a law enforcement officer's request for his identity); United States v. Edwards, 885 F.2d 377, 384-86 (7th Cir. 1989) (concluding that a defendant's unwarned statements in response to identity-related questions posed by police officers at the time of the defendant's arrest were not the products of a custodial interrogation because, among other things, police officers routinely ask such questions during booking); Toler v. United States, 198 A.3d 767, 770-72 (D.C. 2018) (applying the routine booking question exception and perceiving no Miranda violation when, upon arresting the defendant and without providing Miranda warnings, an officer asked for the defendant's social security number).
¶24 We are persuaded by the reasoning of these cases and thus conclude that questions concerning a custodial defendant's name, when asked for administrative — as opposed to investigative — purposes, run no more afoul of Miranda than do the same kinds of questions when asked in a booking center, even if the defendant's responses ultimately turn out to be potentially incriminating. See, e.g., Edwards, 885 F.2d at 385-86 (applying the routine booking question exception to a case in which detectives asked the defendant identity-related questions at the time of his arrest, and noting that "even in an arrest situation such questions will eventually be asked during booking"); State v. Smith, 785 So. 2d 815, 818 (La. 2001) (stating that "[b]ecause the officer's field interview asked for no more information than an individual might supply in response to booking questions as a routine incident of an arrest," the officer's unwarned inquiries did not amount to interrogation for Miranda purposes). ¶25 This is not to say, however, that identity-related questions are always permissible. To the contrary, such questions asked of an in-custody suspect can fall outside the bounds of the routine booking question exception when, for example, a police officer asks such questions in the context of investigating a crime and the question is designed to elicit incriminating information. See, e.g., United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993) (concluding that a law enforcement officer's unwarned questioning regarding the defendant's identity amounted to a custodial interrogation because the officer's questions were not aimed at obtaining general booking information but rather were for the "direct and admitted purpose" of linking the defendant to his incriminating immigration file, specifically, to establish an essential element necessary to convict the defendant of being an undocumented immigrant in possession of a firearm); United States v. Mata-Abundiz, 717 F.2d 1277, 1280 (9th Cir. 1983) (concluding that the routine booking question exception did not apply when the "background questions" that the interrogating officer had asked related directly to an element of a crime that the officer had reason to suspect the defendant had committed and when the questioning was "highly likely to elicit incriminating information"); United States v. Mejia-Flores, No. 8:11 CR 375, 2012 WL 525485, at *8 (D. Neb. Feb. 16, 2012) (concluding that the routine booking question exception did not apply when an officer's request for identity-related information was "directly relevant to the crime being investigated and the information provide[d] a link in the chain of evidence necessary to convict the individual of the offense"); United States v. Valentine, 657 F. Supp. 2d 388, 394 (W.D.N.Y. 2009) (concluding that the routine booking question exception did not apply to identity-related questions when the interrogating officers "had a strong suspicion that [the defendant] was an [undocumented immigrant] in possession of fraudulent documents concerning his identity"); State v. Etienne, 103 Conn.App. 544, 930 A.2d 726, 733-34 (2007) (concluding that the routine booking question exception did not apply when the police asked the defendant identity-related questions in connection with their investigation of a forgery charge). ¶26 The question of whether the routine booking exception applies thus turns on the specific facts of the case and the context in which the officers ask the identity-related questions at issue. We hasten to add, however, that the mere fact that a defendant's identity is an element of every crime does not alone render impermissible questions about the defendant's name. As the North Carolina Supreme Court has stated:
[T]he focus must be on the time and circumstances under which [the information] was obtained, not the use to which it was ultimately put. That the information incidentally helped establish an essential element of the crimes for which defendant was booked does not make it more than routine at the time it was obtained. State v. Banks, 322 N.C. 753, 370 S.E.2d 398, 402-03 (1988) (rejecting the defendant's contention that an officer's question during a booking procedure regarding the defendant's date of birth violated the defendant's privilege against self-incrimination, notwithstanding the fact that the defendant's age was relevant to the sexual assault offenses at issue).
¶27 Indeed, if the mere fact that a defendant's identity is an element of every crime rendered impermissible questions regarding the defendant's name, then the routine booking question exception could never apply. See People v. Alleyne, 34 A.D.3d 367, 828 N.Y.S.2d 2, 3 (N.Y. App. Div. 2006) ("To carry defendant's argument to its logical conclusion, an officer who was aware that an arrestee's true name could link him to a crime could not even ask that elementary question during routine booking without first providing Miranda warnings."). ¶28 Having thus set forth the applicable legal principles, we turn to the facts of this case and first conclude that the officer's question regarding Compos's name amounted to a custodial interrogation. As noted above, the parties do not dispute that once the police tased Compos and placed him into handcuffs, he was in custody for Miranda purposes. See People v. Garcia, 2017 CO 106, ¶ 20, 409 P.3d 312, 317 (noting that a suspect is in custody for Miranda purposes when she "has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that her freedom of action had been curtailed to a degree associated with formal arrest"). Moreover, in light of Muniz, 496 U.S. at 601, 608, 110 S.Ct. 2638, the officer's question amounted to an interrogation. As set forth above, in Muniz, five Justices of the Supreme Court expressly rejected the argument that questions designed to elicit only biographical information do not constitute custodial interrogation because they are not designed to elicit incriminating evidence. The same principle applies here, and therefore, we conclude that the officer interrogated Compos when the officer asked Compos his name. See id. ¶29 The issue thus becomes whether the officer's question was nonetheless proper under the routine booking question exception. For several reasons, we conclude that it was.
¶30 First, in our view, asking Compos his name on the facts presented here was "reasonably related to the police's administrative concerns," specifically, the police's need to determine the identity of the person that they had taken into custody. Id. at 601-02, 110 S.Ct. 2638.
¶31 Second, the record does not reflect that the officer's question was asked in the context (or for the purpose) of investigating a crime. And, as the trial court found, the officer's question was not designed to elicit incriminating information.
¶32 In reaching these conclusions, we are unpersuaded by Compos's assertion that the question at issue falls outside the routine booking question exception because any answer to that question would have tended to establish his identity for purposes of the protection order charge against him. As noted above, a defendant's identity is an element of every charge. We are unwilling to say that that fact alone rendered the officer's question impermissible. See Alleyne, 828 N.Y.S.2d at 3.
¶33 Nor are we persuaded by Compos's argument that his truthful answer would have tended to incriminate him as to the false reporting charge. Again, the record reflects that the officer was merely seeking to confirm that the man in custody was, in fact, Compos, having been told that Compos had threatened his ex-girlfriend and her son with a gun. We are unwilling to adopt a rule that would preclude a police officer from asking a suspect his name in these circumstances, which implicate obvious public (and officer) safety concerns.
¶34 For these reasons, we conclude that, although the officer's question as to Compos's name constituted an unwarned, custodial interrogation of Compos, Compos's response that his name was "John Rocha" was nevertheless admissible under the routine booking exception to Miranda.
C. The New Crime Exception ¶35 As noted above, we also granted certiorari to consider whether the division erred in sua sponte adopting a new crime exception to Miranda. In light of our foregoing disposition, we need not reach this issue. We, however, acknowledge the force of Compos's argument that in adopting this exception on its own, the division violated the party presentation principle. See Greenlaw v. United States, 554 U.S. 237, 243-44, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.... [A]s a general rule, ‘[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.’ ") (quoting Castro v. United States, 540 U.S. 375, 386, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) (Scalia, J., concurring in part and concurring in judgment)); accord United States v. Sineneng-Smith, ––– U.S. ––––, 140 S. Ct. 1575, 1579, 206 L.Ed.2d 866 (2020) ; Galvan v. People, 2020 CO 82, ¶ 45, 476 P.3d 746, 757.
¶36 Accordingly, we vacate the portion of the division's opinion adopting a new crime exception to Miranda, and we leave the question of whether to adopt such an exception for another day.
III. Conclusion
¶37 For the forgoing reasons, we conclude that the officer's question as to Compos's name amounted to a custodial interrogation, but, on the facts presented here, Compos's response was admissible at trial because the question was akin to the type of routine booking question that has been deemed exempt from Miranda's reach.
¶38 Accordingly, we affirm the judgment of the division below, albeit on other grounds, and in light of our determination, we do not consider and thus vacate the portion of the division's judgment establishing a new crime exception to Miranda.
JUSTICE MARQUEZ does not participate.
1 Specifically, we granted certiorari to review the following issues:
1. Whether law enforcement asking a person his name after taking him into custody constitutes an interrogation implicating the person's Miranda rights.
2. Whether the court of appeals erred in creating, as a matter of first impression, a "new crime exception" to the Miranda requirement.