UNITED STATES of America, Appellee,

v.

Fernando CARMONA, Jose Omar Sanchez, Carlos Escobar, Faoud Hassan, Angelica Carvajal, Luz Marina Carvajal, Sophie Mejia Carvajal, Luis Garcia, Jesus Zambrano, Vicky Quinjano, Gonzalo Gaviria, Robert Pietri, Jose Santa Cruz–Londono, Defendants.

Appeal of Gonzalo GAVIRIA, a/k/a "Palestino", Defendant–Appellant.

No. 624, Docket 88–1232.

United States Court of Appeals, Second Circuit.

Submitted Jan. 6, 1989.

Decided April 19, 1989.

Richard A. Hamar, Miami, Fla. (Hamar and Hamar, Miami, Fla., of counsel), submitted brief for defendant-appellant Gonzalo Gaviria.

Ephraim Savitt, Asst. U.S. Atty., E.D. N.Y., New York City (John Gleeson, Asst. U.S. Atty., Andrew J. Maloney, U.S. Atty., E.D.N.Y., New York City, of counsel), submitted brief for appellee.

Before KEARSE, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

Gonzalo Gaviria appeals from a May 22, 1988 judgment of conviction entered in the United States District Court for the Eastern District of New York (McLaughlin, J.), following a two-day jury trial in March 1988. In a one-count indictment appellant and 11 co-defendants were charged with conspiracy to import, possess and distribute large quantities of cocaine between 1980 and March 1984 in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982 & Supp. IV 1986). Three of the co-defendants, Omar Sanchez, Sophie Carvajal and Luz Carvajal were tried and convicted in October 1987 *in absentia*. The conviction of a fourth co-defendant, Carlos Escobar, the only other defendant to appear, was affirmed. *See United States v. Carmona*, 858 F.2d 66 (2d Cir.1988) (*per curiam*). Three of the remaining defendants are fugitives, two were shot to death before trial, and the charges against Fernando Carmona were dropped. Upon conviction appellant was sentenced to a 12–year prison term and fined $25,000. From the judgment of conviction Gaviria appeals. We affirm.

## BACKGROUND

Investigation by the New York Drug Enforcement Task Force revealed that from early 1980 until March 1984 an international cocaine distribution organization headed by Colombian businessman Jose Santa Cruz–Londono was responsible for importing and distributing in the United States nearly 2000 kilograms of cocaine. From this illicit activity the organization, which operated cocaine distribution centers in New York City, Los Angeles, Miami and Houston, reaped millions of dollars in illegal profits.

The New York distribution center was run by "managers," who were responsible for conducting the daily narcotics business affairs for Santa Cruz. These managers included several of Gaviria's co-defendants, namely, Carlos Escobar, Omar Sanchez, Faoud Hassan and Fernando Carmona, as well as Alfredo Cervantes, who was the government's principal trial witness. The managers were responsible for maintaining "stash" locations in which large amounts of cocaine and cash were stored, delivering cocaine in kilogram packages to the organization's "clients," and collecting payments for those deliveries from the clients. The managers also received and stored the cocaine that was transported into New York by automobile or by the organization's airplane, and transferred large sums of cash to Panama where it was "laundered" and deposited in the organization's bank.

Another essential task performed by the managers was the maintenance of detailed accounts, consisting of handwritten ledgers and journals, reflecting the inflow and outflow of cocaine and cash. In particular, these records showed the amount of cocaine measured in kilograms delivered on a specific date to each client and the amount of the payment received. All of the approximately 40 or so clients of the Santa Cruz organization in New York City during the period 1982 through March 1984 were designated in the Santa Cruz organization's drug ledgers by a nickname or "code" name. Each purchased cocaine on a wholesale basis and controlled his or her own

independent distribution network. These written records were seized by DEA agents from members of the Santa Cruz organization. The accounts and ledgers indicated that during the periods from May to December of 1981, and from April of 1982 to March of 1984 one particular client code-named "Palestino" purchased in excess of $800,000 worth of cocaine.

A jury trial took place over two days in early March 1988 and evidence presented there established that "Palestino" is the appellant Gonzalo Gaviria. After appellant's conviction a sentencing or *Fatico* hearing was held on May 27, 1988 to determine, *inter alia*, the reliability and accuracy of certain information contained and statements made in Gaviria's pre-sentence report. In particular, defense counsel challenged the assertion in the report that Gaviria was a "contract killer for the Santa Cruz organization ... responsible for several drug related murders in New York and Florida." Finding the testimony of DEA Agent Jerome McArdle and probation officer Manuel Fuentes to be credible, and the information upon which they testified to be reliable, Judge McLaughlin imposed the earlier noted sentence.

## DISCUSSION

Three issues are raised on appeal. Gaviria contends that the district court: (1) improperly admitted evidence that the name "Lucho" next to the notation "Cali ofici" in the telephone address book seized from him by arresting officers was the same as that of Santa Cruz' brother in Cali, Colombia; (2) erroneously admitted testimony that he identified himself during routine post-arrest questioning by the false name "Carlos Santelli," after he had previously invoked his right to counsel; and (3) impermissibly enhanced his sentence based on hearsay testimony at the *Fatico* hearing which described how five informants, each unknown to the others, had positively identified appellant as a "contract killer." We discuss each of these issues in turn.

### I

The government's chief witness Cervantes testified that Jose Santa Cruz–Lon-dono, the leader of the drug organization, lived in Cali, Colombia and had a brother named Lucho. Cervantes further stated that at Christmas in 1982 he traveled to Cali and was present in both Santa Cruz' office and home. While there, he met Santa Cruz' wife and his brother Lucho. The informant claimed that he met Lucho Santa Cruz several times in Colombia and, on one occasion, in Florida.

In October 1987 appellant was arrested in Miami, Florida by officers of a DEA task force that had a warrant for his arrest. Upon performing a routine search of appellant's clothing, the officers discovered a red telephone-address book. Among the handwritten entries was the name "Lucho" above the words "Cali ofici" and a telephone number. The exhibit was offered and received into evidence without objection. Defense counsel's earlier motion to exclude this evidence had prompted a ruling from Judge McLaughlin that the address book was admissible under Fed.R. Evid. 401, and that the defense could attack the weight to be accorded it.

■ "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Under Rule 401 relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The central issue in this case was Cervantes' identification of appellant Gaviria as "Palestino," the nickname or code name by which he was known to the Santa Cruz ring. Palestino was described by Cervantes as a customer of the Santa Cruz organization. It was in that capacity, according to the informant, that he met appellant. The fact that Gaviria carried the name and telephone number of Santa Cruz' brother in his address book is an important piece of evidence. It corroborated Cervantes' identification of appellant as "Palestino," by linking Gaviria to the Santa Cruz operation. Thus, the red address book satisfies the test of relevance in

Rule 401 because it made the correctness of Cervantes' identification "more probable" than it would have been without it.

A trial court's conscientious assessment of the relevance of proffered evidence against its potential prejudice will stand unless an appellate court believes the trial judge abused his discretion and acted arbitrarily. *See United States v. Birney*, 686 F.2d 102, 106 (2d Cir.1982); *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir.1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). Appellant claims that the chain of inferences needed to connect him to the ultimate fact to be proved—that he was a member of the Santa Cruz cocaine conspiracy—was so attenuated that the probative value of the "Lucho" testimony was outweighed by its potential prejudice. In particular, appellant makes two arguments. First, he notes that Cervantes testified that he met Lucho Santa Cruz in Cali, Colombia in 1982. Appellant was arrested some years later. Thus, Gaviria argues that the passage of time between Cervantes' alleged acquaintance with Lucho and his (Gaviria's) arrest weakens the corroborative impact of the proffered evidence, but continues its potentially prejudicial effect. Also, keeping in mind that Cali is a city of two million people and that "Lucho" is a common name, Gaviria argues that it is uncertain whether the "Lucho" Cervantes knew was the same "Lucho" that is Jose Santa Cruz' brother. Relying primarily on a panel's prior decision in *United States v. Robinson*, 544 F.2d 611 (2d Cir.1976), *rev'd en banc*, 560 F.2d 507 (2d Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed. 2d 496 (1978), he argues that the relevance of this evidence was outweighed by its prejudicial effect, and the reversal is required. We disagree.

First, the alleged weaknesses of the inferences are matters typically addressed to the weight of the evidence. Here, whatever "weaknesses" exist do not indicate that Judge McLaughlin's receipt of the Lucho testimony was arbitrary or otherwise beyond "the wide, and wise, discretion of the trial court." *United States v. Medico*, 557

F.2d 309, 317 (2d Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977); *United States v. Harvey*, 526 F.2d 529, 536 (2d Cir.1975) (discussing Fed.R. Evid. 403), *cert. denied*, 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976). Moreover, appellant's reliance on the panel decision in *Robinson*, 544 F.2d 611 (2d Cir. 1976), is entirely misplaced. There the evidence linking defendant to an armed robbery, in which a .38 caliber handgun was used, was defendant's possession of such gun weeks after the robbery. The panel decision reversed defendant's conviction and held that mere possession of a .38 ten weeks after the robbery, unaccompanied by any other suggestive circumstances, was too weak an inference to link defendant to the crime. *Robinson*, 544 F.2d at 617. Upon an *en banc*, the panel decision was reversed and vacated, and Robinson's conviction was affirmed. *See Robinson*, 560 F.2d 507 (2d Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). We held that the trial judge had carefully considered the probative value of the evidence as against its prejudicial effect, and had "delayed its admission until virtually all of the other proof had been introduced," the better to ascertain its prejudicial effect. 560 F.2d at 515. As such, there was no abuse of discretion. *Id.* at 515–16.

Moreover, *Robinson* presented a much closer question than the instant case. Here, defense counsel stated that he had no objection to the jury seeing the notebook or hearing that Jose Santa Cruz had a brother named Lucho. Counsel objected only to Cervantes' testimony about Lucho. With the notebook before the jury, and an acknowledgement that Santa Cruz' brother was named Lucho, Cervantes' testimony was not problematic—it was the final piece in a carefully constructed evidentiary pattern. Nor could it have then resulted in the "unfair prejudice" required by Rule 403 to exclude otherwise relevant evidence. This was not an "undistinctive" handgun as in *Robinson;* instead it was relevant corroborating testimony going to the issue of the identity of "Palestino." The district

court's admission of the testimony was therefore well within its discretion.

## II

■ The second issue appellant raises concerns pedigree information obtained after he was arrested when the police were "booking" him. In response to what the arresting officer testified were routine questions to elicit personal history, such as appellant's name and what he was doing in the United States, appellant produced a card with his photo, but with the name "Carlos Santelli" purportedly identifying the person pictured on the card. Appellant stated that he was a Colombian tourist. The officer immediately advised appellant that the officer knew appellant was Gaviria and showed appellant a picture the officer had of him. There is no question therefore that the officer, who had an arrest warrant, had been briefed and knew Gaviria's true name and had his photograph. Appellant claims therefore that the questions asked were to "set him up" to give an alias because the officers, according to Gaviria, not only knew him but also knew that he used aliases. In addition, Gaviria says that because he told the officer that he did not want to make any statement, and that he wanted to speak with his lawyer, his rights under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), were violated.

The underlying principles that prompted the prophylactic rule enunciated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been examined in several cases. *See, e.g., United States v. Gotchis*, 803 F.2d 74 (2d Cir.1986); *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109 (2d Cir.1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). The basic concern was to protect a suspect ignorant of his rights from an investigative interrogation intended to elicit information about crimes and the suspect's possible involvement in them. This type of custodial questioning, which *Miranda* bars, was contrasted in *LaVallee* and *Gotchis* with the sort of basic information needed to facilitate the booking and arraigning of

a suspect. *Gotchis*, 803 F.2d at 78–79; *LaVallee*, 521 F.2d at 1112–13.

For example, in *Gotchis* we held that "[r]outine questions ... ordinarily innocent of any investigative purpose, do not pose the dangers *Miranda* was designed to check." *Id.* at 79. In any case, obtaining such pedigree information has not been viewed as unlawful custodial interrogation. *See United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir.1988) (obtaining defendant's nickname before *Miranda* warnings proper solicitation of suspect's identity and background).

Appellant's "set-up" argument is frivolous. An arresting officer cannot assume that when he asks a suspect for his name he will be given a false answer. Police often know the names of suspects they intend to apprehend, particularly when the arrest results after a lengthy investigation. As a cautionary measure, police usually prudently inquire as to the suspect's name to ensure that the wrong person is not apprehended. If the suspect chooses to give an alias, it may work to his prejudice. The information requested here—merely a name—was simply that identification of a suspect necessary for his booking and arraignment.

Moreover, in *Edwards v. Arizona*, the interrogation was not seeking pedigree information or basic identifying data. Instead, after having told the police that he only wanted to deal with them through counsel, the suspect in *Edwards* was subjected to full custodial interrogation which aimed at—and succeeded in—eliciting a confession. 451 U.S. at 484, 101 S.Ct. at 1884. The Supreme Court held that it was inconsistent with *Miranda* for the police, on their initiative, to reinterrogate a suspect in custody when he had clearly asserted his Sixth Amendment right to counsel. *Id.* at 485, 101 S.Ct. at 1885.

The present case, of course, involved no reinterrogation after appellant had invoked his right to counsel. Nor were the questions intended, as in *Edwards*, to elicit a confession or incriminating information. The police meant only to gather ordinary information for administrative purposes.

Consequently, appellant's attack on the government's use of his false pedigree statement is without merit.

## III

The final question posed is whether the district court improperly enhanced appellant's sentence on the basis of uncorroborated and unreliable hearsay. The challenge to the sentence is made on two grounds. First, appellant claims that he was denied due process because the district court considered evidence from a past trial where appellant—who was not a defendant or represented by counsel—was unable to confront or cross-examine the witness. Second, Gaviria claims that the testimony at the *Fatico* hearing was unreliable, particularly in view of the fact that the informant Cervantes, the government's principal witness, did not testify at the hearing.

■■■ With respect to the first contention, there is no doubt that the Due Process Clause is implicated at sentencing, and that a defendant has a right to question procedures that lead up to the imposition of sentence. *See Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed. 2d 393 (1977). But all of the strict procedural safeguards and evidentiary limitations of a criminal trial are not required at sentencing. *Williams v. New York*, 337 U.S. 241, 250, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1949); *United States v. Fatico*, 579 F.2d 707, 711 (2d Cir.1978). It is not a denial of due process for the trial judge, when determining sentence, to rely on evidence given by witnesses whom the defendant could neither confront nor cross-examine. *Williams*, 337 U.S. at 250–51, 69 S.Ct. at 1084–85. The fact that some material, upon which the trial judge relied, may have had its source in a judicial proceeding in which appellant was not a defendant or represented by counsel does not bar its use. The sentencing court's discretion is "largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). Any information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination. *See Williams*, 337 U.S. at 249–50, 69 S.Ct. at 1084–85; *United States v. Pugliese*, 860 F.2d 25, 29 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1344, 103 L.Ed.2d 813 (1989). Hence, appellant's due process challenge to the source of the information used by Judge McLaughlin must fail.

Appellant next challenges the reliability of the testimony at the hearing. We have held that a sentencing judge may rely on hearsay information from an unidentified source when there is "good cause for not disclosing [the identity of the source], and the information he furnishes is subject to corroboration by other means." *Fatico*, 579 F.2d at 709. Here, appellant relies on *United States v. Reme*, 738 F.2d 1156 (11th Cir.1984), *cert. denied*, 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985), and argues that when hearsay is used to enhance a sentence there should be "a showing of 'particularized guarantees of trustworthiness.'" *Id.* at 1168 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). The discussion in *Roberts* dealt with the indicia of reliability implicated when hearsay is admitted at a criminal trial. *See Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. In *Reme* itself the court did not rule that hearsay is unreliable at sentencing. It simply held that the enhanced sentence in that case was based on hearsay testimony that "lacked [sufficient] indicia of reliability and [was] largely contradicted" by other proof presented earlier at trial. *Reme*, 738 F.2d at 1168.

■■ In the instant case, evidence presented at the May 27 sentencing hearing was largely uncontradicted and possessed adequate indicia of reliability. Gaviria argues initially that there was no good reason why Cervantes was not called to testify. Apparently there was no application made to have Cervantes produced to testify, which the defense had a right to do had the defense been so advised. In failing to call Cervantes, appellant waived the issue of his not testifying. *See United*

*States v. Mennuti,* 679 F.2d 1032, 1036 (2d Cir.1982).

▮ Gaviria further contends that absent the informant's testimony the proof before the district court was untrustworthy. The enhancement of appellant's sentence resulted from DEA Agent McArdle's hearsay testimony that "Palestino" was the "enforcer" for the Santa Cruz organization. The proof presented at the pre-sentence hearing demonstrated that, from at least 1982 until his arrest in May 1987, appellant served as the chief contract killer for the Santa Cruz organization and headed a group of "hit" men known as "Los Palestinos." The evidence also showed that on Santa Cruz' orders, appellant assassinated narcotics operatives who either had failed to pay their debts or were suspected of cooperating with law enforcement authorities.

Agent McArdle relied on five different sources, none of whom had any knowledge of the others. Gaviria was identified as Palestino by Cervantes at trial by use of his photograph, and by Source No. 1 and Source No. 3. Agent McArdle, who debriefed Cervantes, learned from him that Martin's Bar on Broadway near Lincoln Center in Manhattan was a meeting place for members of the Santa Cruz ring. In November 1981 Cervantes was present there with Gaviria, Jose Santa Cruz–Londono and Freddy Aquilaro. During the conversation, Aquilaro and appellant related how they had gone to another bar in New York City and followed a certain individual into the men's room, where Palestino murdered him. Cervantes was told by Santa Cruz that "Los Palestinos" were the enforcement arm of his organization, and that appellant was the head of the Palestinos. Another piece of proof involved a drug courier named "Henry" who had been sent to Panama to launder drug money. It was discovered that "Henry's" money count came up short. Cervantes was later told by appellant's co-defendant Fernando Carmona that while Gaviria rode as a passenger on the back of Carmona's motorcycle, he shot and crippled "Henry" in an attempt to kill him.

The agent later spoke to Source No. 1. He confirmed that the photograph he saw of appellant was Palestino and that appellant had killed Romero Osorio, then a member of the Santa Cruz group in 1985 on Long Island, New York. According to McArdle's testimony, Sources No. 2 and No. 3 confirmed an equally grisly report of a double murder of co-defendants Luis Garcia Soto and Vicky Quijano, both indicted with appellant, and reportedly murdered by him on April 9, 1987. Cervantes did not know Sources No. 1, No. 2 or No. 3, and they did not know each other. Finally, a 1986 shooting was testified to by the U.S. Probation officer who prepared appellant's pre-sentence report. He stated that a New York City police officer told him that the victim of a shooting, who later died, told the attending paramedic that Gaviria was his assailant.

All of these independent accounts meshed and plainly gave Judge McLaughlin an ample basis for ruling that the hearsay testimony was reliable because, as the sentencing judge stated, "all of these sources interlock and point the finger at the defendant as a contract killer for the Santa Cruz organization." These sources are sufficiently independent and similar to corroborate the hearsay evidence. In our view the government established the disputed allegations in the pre-sentence report by a preponderance of the evidence, *United States v. Lee,* 818 F.2d 1052, 1057 (2d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). Nor can the findings be said to be clearly erroneous.

## CONCLUSION

Accordingly, for the reasons stated the judgment of conviction is affirmed.