**UNITED STATES of America,**
**Plaintiff,**

v.

**Cleveland Nathaniel VALENTINE,**
**a/k/a Jonas, a/k/a Dean Gray,**
**Defendant.**

**No. 08–CR–6124L.**

United States District Court,
W.D. New York.

Sept. 16, 2009.

Tiffany H. Lee, U.S. Attorney's Office, Rochester, NY, for Plaintiff.

## DECISION AND ORDER

DAVID G. LARIMER, District Judge.

This Court referred all pretrial motions and other preliminary matters in this case to United States Magistrate Judge Jonathan W. Feldman pursuant to 28 U.S.C. § 636(b). Defendant, Cleveland Valentine, moved to suppress statements that he made to the police at around the time of his arrest on March 16, 2008 in Rochester, New York.

Magistrate Judge Feldman held a suppression hearing and also gave counsel an opportunity to submit post-hearing briefs.[1] On July 9, 2009, Magistrate Judge Feldman issued a Report and Recommendation (Dkt. # 30), familiarity with which is assumed, recommending that Valentine's motion to suppress be granted.

The Government has filed objections (Dkt. # 31) to the Report and Recommendation. I have reviewed both the Report and Recommendation and the Government's objections, as well as the transcript of the suppression hearings (Dkt. # 26). I believe that the Magistrate Judge's Report and Recommendation is sound and correct and, accordingly, I adopt it.

## DISCUSSION

### I. Standard of Review

A district court reviews those portions of a report and recommendation to which a

---

1. The Government filed a post-hearing brief. Defendant did not.

party has timely objected under a *de novo* standard of review. 28 U.S.C. § 636(b)(1)(C). After reviewing the Report and Recommendation and the objections thereto, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

■ If the magistrate judge made credibility findings with respect to witnesses' testimony at a suppression hearing, the district court has discretion to accept those findings based on the written record, but the court may not reject the magistrate judge's credibility findings without conducting an evidentiary hearing at which the district judge has the opportunity to observe the witnesses and evaluate their credibility firsthand. *See In re Karten,* 293 Fed.Appx. 734, 736 (11th Cir.2008) ("The Supreme Court has held that a district judge has broad discretion to accept a magistrate's credibility findings without hearing witness testimony, in the criminal suppression hearing context, consistent with due process") (citing *United States v. Raddatz,* 447 U.S. 667, 680–81, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)); *Cullen v. United States,* 194 F.3d 401 (2d Cir.1999) ("without an evidentiary hearing, the District Court could not reject the Magistrate Judge's proposed credibility finding").

■ The district court may adopt those portions of a report and recommendation to which no objections have been made, as long as no clear error is apparent from the face of the record. *See White v. Fischer,* No. 04–CV–5358, 2008 WL 4210478, at *1 (S.D.N.Y. Sept. 12, 2008). The clearly-erroneous standard also applies if a party makes only "conclusory or general objections, or simply reiterates his original arguments." *Barratt v. Joie,* No. 96–CV–324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002).

## II. The Magistrate Judge's Findings and Conclusions

In the case at bar, Magistrate Judge Feldman based his recommendation that defendant's suppression motion be granted on several findings. First, he found that "*Miranda* warnings were never given to Valentine at any point during his March 16th encounter with law enforcement." Dkt. # 30 at 8. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Government does not appear to object to or disagree with that finding.

Second, the magistrate judge concluded that Valentine was "in custody," for *Miranda* purposes, at the time that he made the statements in question, based on the factors set forth by the Second Circuit in *United States v. Newton,* 369 F.3d 659 (2d Cir.), *cert. denied,* 543 U.S. 947, 125 S.Ct. 371, 160 L.Ed.2d 262 (2004). Dkt. # 30 at 11–16. The Government objects to that finding, particularly as to the statements made by defendant in the back of the police vehicle, prior to his being taken to the Public Safety Building for further questioning.

Magistrate Judge Feldman also found that Valentine's statements were not admissible under the "pedigree exception" to *Miranda,* under which the "solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda* [,] ... whether the solicitation occurs before ... or after ... *Miranda* warnings are given." *United States v. Adegbite,* 846 F.2d 834, 838 (2d Cir.1988) (citations omitted). The Magistrate Judge found the pedigree exception inapplicable in this case, on the ground that the questions asked by the officers were not designed simply to gather routine, innocuous information, but to elicit an in-

criminating response. Dkt. # 30 at 18–20. The Government objects to those findings and conclusions as well.

### III. Whether Defendant Was in Custody at the Time the Statements Were Made

■ It is well settled that police may not interrogate a suspect who has been taken into custody without first advising him of his *Miranda* rights. *Newton,* 369 F.3d at 668. *Miranda*'s "in custody" requirement is met if questioning was "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." *United States v. Morales,* 834 F.2d 35, 38 (2d Cir.1987). Determining whether an individual is "in custody" requires the court to decide whether a reasonable person would have felt that he "was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

Where there has been no formal arrest, then, the relevant judicial inquiry is whether the "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Ali,* 86 F.3d 275, 276 (2d Cir.1996) (internal quotation and citation omitted). *See also Newton,* 369 F.3d at 671 ("The test for custody is an objective one: 'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest' ") (quoting *United States v. Ali,* 68 F.3d 1468, 1472 (2d Cir. 1995)).

■ In determining whether *Miranda* applies, the court must look at the totality of all the circumstances involved in the interrogation, including whether the suspect was advised of his right to leave, the location and atmosphere of the questioning, the language and tone used by the officers, whether the suspect was patted down, searched or frisked, and the length of the interrogation. *Tankleff v. Senkowski,* 135 F.3d 235, 244 (2d Cir.1998). *See also United States v. Badmus,* 325 F.3d 133, 138 (2d Cir.2003) (stating that a person may be in custody even absent formal arrest, and that it is sufficient "when law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave").

■ Reviewing the record here, I concur with the magistrate judge's finding that Valentine was in custody at the time that he made the statements in question, including the statements that he made in the back seat of the police vehicle. While the Government emphasizes the facts that Valentine was not handcuffed and that the vehicle's back door was open, I am not persuaded by the Government's contention that a reasonable person in defendant's position would have felt free to terminate the interview in the back of the police car and leave.

The Government's contention that Valentine "willingly" went to Officer Moses's car to answer questions concerning his identity, Dkt. # 31 at 19, begs the question. The mere fact that Valentine was not physically forced into the vehicle does not mean that he could reasonably have believed that he had much choice in the matter. Under the circumstances—defendant having been pulled over, informed that the police were investigating a stabbing that occurred in a bar from which Valentine had just come, told to get out of his car, frisked, and then directed to take a seat in the back of the police car (which is hardly typical of a routine traffic stop)— the average person in defendant's shoes would not reasonably have believed that he

could simply refuse and go on his way. Even if, as the Government now contends, the officer framed his statement about getting into the back of the police car in the form of an "invitation," it could hardly have sounded like an invitation that Valentine could easily have declined.

The fact that Valentine "terminated" his phone conversation with Agent Garcia also means little in this regard. Valentine's ability, at the push of a button, to end a telephone conversation with someone miles away has scant bearing on how he could reasonably have assessed his ability to leave the scene, when he was sitting in the back of a police car with two officers present. That point is reinforced by Valentine's subsequent ending of a second phone call with Garcia at the Public Safety Building, from which he was even more clearly not free to leave.

In that regard, the Government makes little effort to argue that Valentine was not in custody by the time he was taken to the Public Safety Building, and I believe that he clearly was. Valentine was taken to an interview room, where he was subjected to further questioning, and he was never given any indication that he could put an end to the questioning any time he wanted to and walk out. Considering all that had transpired up to that point, Valentine could not reasonably have believed that the officers would allow him to leave.

## IV. Pedigree Exception

■■ I further agree with Magistrate Judge Feldman that Valentine's statements do not fall within the pedigree exception to the *Miranda* rule. The pedigree exception generally covers "routine" questions designed to elicit "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). The pedigree excep-

tion does not include questions designed to elicit incriminating admissions. *Id.* at 602 n. 14, 110 S.Ct. 2638. As the Second Circuit has observed, "[r]outine questions about a suspect's identity ... [are] ordinarily innocent of any investigative purpose [and] do not pose the dangers *Miranda* was designed to check; they are rather the sort of questions 'normally attendant to arrest and custody.'" *United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

In support of its argument that the exception applies here, the Government relies, as it did before the Magistrate Judge, on my decision in *United States v. Kadem*, 317 F.Supp.2d 239 (W.D.N.Y.2004). In *Kadem*, in which the defendant was charged with making a false statement and similar offenses, this Court, adopting a Report and Recommendation of the magistrate judge to whom the case had been referred, granted the defendant's motion to suppress certain statements that he made to an Immigration and Customs Enforcement ("ICE") investigator, prior to any *Miranda* warnings being given.

In *Kadem*, I did also rule that "basic pedigree information" elicited by the investigator concerning the defendant's name and the date and place of his birth (which were falsely stated by the defendant, leading to the charges against him) could be introduced in the Government's case in chief. *Id.* at 243. Significantly, however, the reason why the investigator wanted to speak to the defendant was not because the investigator suspected him of using a false name, being an undocumented alien, or otherwise having violated the immigration laws. Rather, the investigator initiated the interview because he had received a report of a suspected alien being held in state custody on criminal charges, which

might have subjected the alien to deportation upon his release.

In my decision in *Kadem,* then, I noted that although the defendant was in custody at the time that he provided the pedigree information, "[t]here is no evidence that [Investigator] Yera knew the person that had been brought to the interview room and, therefore, it was entirely reasonable and proper for Yera to attempt to ascertain the name of the man before him and to make sure he was the same person that had been identified in the" report. *Id.* at 241. Based on that evidence, I expressly "f[ou]nd that Yera's purpose [in asking those pedigree questions] was not to seek incriminating evidence for criminal prosecution but to simply ascertain the name and identity of the person" with whom he was speaking. *Id. See also United States v. Rodriguez,* 356 F.3d 254, 259 (2d Cir. 2004) (no *Miranda* warning was required where agent's interview of defendant "was conducted solely for the purpose of determining whether Rodriguez would be subject to administrative detention after his release," and "[t]here [wa]s nothing in the record to indicate that Agent Smith knew or should have known that evidence for an eventual prosecution would emerge from his administrative interview of Rodriguez"); *United States v. Salgado,* 292 F.3d 1169, 1172 (9th Cir.) (*Miranda* warnings were not required prior to questioning defendant about his birthplace and citizenship, since interview was being conducted "solely for the administrative purpose of determining whether Salgado was deportable when he got out of jail" on charges having "nothing to do with his immigration status"), *cert. denied,* 537 U.S. 1011, 123 S.Ct. 479, 154 L.Ed.2d 413 (2002).

In contrast, in the case at bar, one of the officers who was present at the time of the initial stop, Officer Wilfredo Carbonel, happened to be there because he had been parked nearby in a "plain clothes vehicle," as part of an investigation "looking for individuals ... that were illegal that may not have proper documentation to be in this country...." Tr. at 25–26. One of the persons that Carbonel was specifically looking for was "Dean Gray" (the alias that defendant was using), because Carbonel "had information from [ICE] Agent [José] Garcia that Mr. Gray had some issues with a fraudulent documents investigation that [Garcia] was conducting." Tr. at 26.

Carbonel also had "information that [Gray] was possibly driving around in a green Toyota 4 Runner," *id.,* and on the night in question, a vehicle fitting that description was parked outside a bar near Carbonel's location. At around 2:00 a.m., Carbonel heard a radio call go out about a stabbing at the bar. A short time later, Carbonel saw "Dean Gray," with a female companion, exit the bar, get into the Toyota, and drive away. Tr. at 26–27.

Officer Moses, responding to the call about the stabbing, pulled defendant over. Carbonel followed and parked his car behind Moses's vehicle. Defendant identified himself to Moses as Dean Gray. Carbonel testified that "[w]e [*i.e.,* Carbonel and Officer Moses] had Mr. Gray step out of the vehicle," and "had him sit in the rear of [Moses's] vehicle...." Tr. at 28–29. While Moses spoke with "Mr. Gray," Carbonel called Agent Garcia on the telephone. Tr. at 29.

Garcia testified at the suppression hearing that he told Carbonel to have Officer Moses ask defendant "where he was born, what country he was a citizen of, and what was his Social Security number." Tr. at 53. At that point, Carbonel simply handed the phone to defendant, so that Garcia could speak to him directly. Tr. at 29, 53. It was during his conversation with Garcia that defendant made the first set of state-

ments sought to be suppressed here, to the effect that he had been born in the United States Virgin Islands, that he was an American citizen, and so on.[2]

Clearly, then, the officers were not simply asking "routine" questions to ascertain the identity of the person to whom they were speaking, and to make sure that they had not apprehended the wrong individual. They had a strong suspicion that "Dean Gray" was an illegal alien in possession of fraudulent documents concerning his identity. Under those circumstances, their questions about defendant's name, birthplace, and similar information stand in sharp contrast to those of the investigator in *Kadem,* who had no particular reason to think that the person whom he was interviewing was using a false identity to avoid detection of his unlawful immigration status. *See also United States v. Toribio-Toribio,* No. 09–cr–161, 2009 WL 2426015, at *2 (N.D.N.Y. Aug. 6, 2009) (where officer "was reasonably aware of who he was interviewing[, and] had ample reason to believe that Defendant was falsely representing his citizenship, ... obtaining basic pedigree information ... was not just obtaining necessary background information, but was likely to provide the primary evidence supporting any violation" of the immigration laws, since in an immigration case, "questions pertaining to place of birth go beyond basic pedigree information and go to the heart of the crime itself"); *United States v. Piggott,* No. 93–CR–199, 1994 WL 228626, at *8 (W.D.N.Y. May 16, 1994) (since customs inspector suspected defendant of having presented an altered passport, and had verified his actual identity, inspector's "questioning of defendant

about his identity was likely to elicit (and did elicit) incriminating information about defendant's immigration status, as well as defendant's alleged use of a falsified passport," and could not constitutionally be conducted absent prior *Miranda* warnings).

## V. Government's Request to Reopen the Suppression Hearing

■ In its objections to the Report and Recommendation, the Government also states that "[t]o the extent that the record requires further clarification," the Government requests that the Court "reopen" the suppression hearing, to take further evidence concerning the length of time over which the relevant events occurred, exactly what was said to defendant that prompted him to take a seat in the back of Officer Moses's police car, and what the officers knew about defendant's immigration status at the time that he made the statements at issue. Dkt. # 31 at 24–25.

The Government's request is denied. If the Government believed that these matters were not sufficiently clarified at the suppression hearing before Magistrate Judge Feldman, it had every opportunity and incentive to explore those matters further at that hearing. The Government's present request amounts to little more than an attempt at a second bite at the apple, in the hope that this time around the result will be more favorable to the Government. Moreover, I do not agree with the Government's assertion that any of these matters need further clarification. As the above discussion demonstrates, the relevant facts are clear. They simply do

---

**2.** Although he did not give defendant full *Miranda* warnings concerning his constitutional rights, Garcia testified that he did advise defendant "that any statements he made to [Garcia] that were not the truth construed [sic] a violation" of federal law. Tr. at 53.

Though that warning did not satisfy *Miranda,* it is some indication that Garcia realized that Valentine might well respond falsely to Garcia's questions concerning his identity and national origin.

not support the Government's position. *See In re Terrorist Bombings of U.S. Embassies in East Africa,* 552 F.3d 177, 196–97 (2d Cir.2008) (outlining factors that district court should consider in deciding whether to grant motion to reopen suppression hearing).

## CONCLUSION

I accept and adopt the Report and Recommendation (Dkt. # 30) of United States Magistrate Judge Jonathan W. Feldman. Defendant's motion to suppress statements (Dkt. # 20) is granted. The statements that defendant made to the police on March 16, 2008 in response to questioning about his identity, birthdate, birthplace, and citizenship, prior to defendant's being given his *Miranda* warnings, are suppressed.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

JONATHAN W. FELDMAN, United States Magistrate Judge.

### *Preliminary Statement*

By Order of Judge David G. Larimer, dated June 16, 2008, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A). (Docket # 11). Currently before the Court are motions by defendant Cleveland Valentine (hereinafter Valentine or defendant) to suppress certain evidence the government intends on using at trial. (Docket # 20). A suppression hearing was held on February 26, 2009 and the hearing transcript was filed on April 13, 2009. Subsequent to the hearing, the parties were given until May 27, 2009 to file post-hearing briefs. The government filed a post-hearing brief (Docket # 28) and the defendant did not. The following is my Report and Recommendation as to the defendant's motions.

### *Findings of Fact*

During the early morning hours on March 16, 2008, Officer Myron Moses of the Rochester Police Department ("RPD") responded to a call of a stabbing at the Eclipse Nightclub on Thurston Road in the City of Rochester. *See* Transcript of Suppression Hearing held on February 26, 2009 (hereinafter "Tr. at ——") at pp. 5–6. As he was exiting his marked police car, Moses was notified by the police dispatcher that the suspect in the stabbing was a black female who was attempting to leave the nightclub. (Tr. at 6–7). Spotting a green Toyota with a black female passenger leaving the nightclub parking lot, Moses decided to get back in his car and follow the Toyota. (Tr. at 7). Moses saw the Toyota turn on to Thurston Road and heard a radio transmission from RPD Officer Wilfredo Carbonel who wanted the Toyota stopped. (Tr. at 7). Moses turned on the emergency lights of his police car and proceeded to stop the Toyota at the corner of Thurston Road and Chili Avenue. (Tr. at 7). An unmarked police vehicle driven by Officer Carbonel pulled up behind Moses's police car. (Tr. at 8). Carbonel exited his car in order to assist Moses with the stop of the Toyota. (Tr. at 8). At the time of the stop, Moses testified that he had no information that the defendant had done "anything wrong." (Tr. at 22).

Officer Carbonel was working in a plain clothes capacity on March 16, 2008. (Tr. at 25). Carbonel was in the vicinity of the Eclipse Nightclub as part of a law enforcement team that was looking for individuals "that were illegal [and] that may not have proper documentation to be in this country." (Tr. at 25–26). One of the individuals who Carbonel was looking for was the defendant. (Tr. at 26). Carbonel had been told by United States Immigration & Customs Enforcement Agent Jose

Garcia that Garcia was conducting a fraudulent document investigation involving the defendant. (Tr. at 26). Carbonel also believed that Valentine was involved in marijuana trafficking. (Tr. at 43–44). Carbonel knew that Valentine was possibly driving around in a green Toyota 4 Runner and had observed a green 4 Runner in the Eclipse parking lot that night. (Tr. at 26). At around 2:00 a.m., Carbonel observed the defendant and a black female exit the nightclub and get in the 4 Runner. (Tr. at 26). Moses immediately issued a request over the police radio for a uniformed police vehicle to stop the green Toyota 4 Runner. (Tr. at 27). As Officer Moses was stopping the vehicle, Carbonel was pulling up behind Moses in his unmarked car. (Tr. at 27). Officer Moses approached the Toyota on the driver's side and Carbonel on the passenger side of the car. (Tr. at 27). Moses asked the driver (later identified as the defendant) for his license, registration and insurance card. (Tr. at 9). The defendant produced a license in the name of Dean Gray and asked the female passenger (later identified as Jennifer White) to produce the registration and insurance card because the car belonged to her. (Tr. at 9). After the documents were produced, Valentine asked Moses why they were being stopped. (Tr. at 9). Officer Moses told Valentine that they were investigating a stabbing that had occurred at the Eclipse Nightclub earlier that night. (Tr. at 9).

While Officer Moses spoke to the defendant, Officer Carbonel called Agent Garcia. (Tr. at 29). Holding the license, Moses returned to his police vehicle in order to run a record check on the defendant. (Tr. at 9–10). Officer Carbonel told Moses that he had been informed by United States Immigration & Customs Enforcement Agent Jose Garcia that Valentine was "possibly" an illegal alien. (Tr. at 10). Armed with the information about Valen-

tine, Officer Moses returned to the Toyota. (Tr. at 28). Valentine was "taken out" of the vehicle, frisked for weapons and directed to "have a seat" in the back seat of the police car. (Tr. at 11, 18). Moses left the back door of the police vehicle open. (Tr. at 11). While waiting for the record check to be completed Officer Moses was informed that Ms. White was not the suspect wanted for questioning in the nightclub stabbing. (Tr. at 18).

Officer Carbonel then called Agent Garcia and, after a brief telephone conversation, handed the phone to Officer Moses. (Tr. at 10, 32). According to Moses, Agent Garcia directed Moses to ask the defendant a "series of questions in regards to his 'illegalization' in the United States." (Tr. at 10). Officer Moses testified that once he had spoken to Agent Garcia and been informed of the identification investigation, Valentine was not free to leave. (Tr. at 17). Officer Carbonel testified that at no point in his encounter with Valentine that evening was Valentine free to leave. (Tr. at 44).

Moses went back to the car and asked Valentine where he was born. (Tr. at 12). Valentine told Moses that he was born in the Virgin Islands and Moses asked if he was a United States citizen. (Tr. at 12). Valentine responded that he was. (Tr. at 12). Officer Moses then asked Valentine to tell him his social security number and Valentine could only provide five numbers. (Tr. at 12), When Moses was done with his conversation with Valentine, he handed phone to Officer Carbonel who resumed his conversation with Agent Garcia. (Tr. at 12). Carbonel eventually handed the phone to Valentine so Agent Garcia could speak directly with the defendant. (Tr. at 30). Valentine remained in the back seat of the marked police car. (Tr. at 13). Agent Garcia testified that he immediately identified himself to Valentine and warned

him that any false statements made during their telephone conversation could be a crime. (Tr. at 53). Garcia then asked Valentine what country he was a citizen of and Valentine responded that he was "born in the U.S. Virgin Islands." (Tr. at 54). After further questioning about his identity and social security number, Garcia warned him that falsely representing himself to be a citizen of the U.S. was a crime. (Tr. at 54). Agent Garcia then asked: "Are you sure you are a U.S. citizen?" and Valentine responded "Yes." (Tr. at 54). Valentine then became "agitated and hung up the phone." (Tr. at 54). Carbonel told Moses that Valentine was going to be taken downtown. (Tr. at 13). Officer Moses then returned to the Toyota to let Ms. White know that Valentine would be taken downtown in the police vehicle. (Tr. at 13). Agent Garcia called Officer Carbonel and told him that he was going to go to his office to confirm the information provided by the defendant. (Tr. at 55). Carbonel told Garcia that they were going to transport the defendant to the downtown Public Safety Building ("PSB") for more questioning. (Tr. at 55).

After arrival at the PSB, Valentine was escorted to an interview room on the fourth floor. (Tr. at 16). From his federal office, Agent Garcia called Officer Carbonel. (Tr. at 56). After speaking with Garcia, Officer Carbonel again gave the phone to the defendant. (Tr. at 56). Garcia testified that he again asked Valentine if he was a U.S. citizen and Valentine again said yes. (Tr. at 56–57). Garcia then advised Valentine that he knew Valentine was not a U.S. citizen and was using a social security number that did not belong to him. (Tr. at 57). Garcia told Valentine that there was no benefit to lying to him and that when Valentine's "associates" tried to do the same thing, they ended up

in jail. (Tr. at 57). Valentine then "terminated" the phone conversation. (Tr. at 57). Carbonel advised Valentine he was under arrest for possession of a false instrument, placed him in handcuffs and took him to the PSB booking area. (Tr. at 38). During the booking process, Valentine identified his place of birth as Jamaica, then tried to change it to simply "the Islands." (Tr. at 39).

Agent Garcia testified that at the time Valentine was stopped by Officer Moses on March 16, 2008, his federal agency ("ICE")[1] had an active investigation into the defendant's activities, including drug distribution and money laundering, and "we were trying to wait for the right time to arrest him." (Tr. at 60–61). Garcia testified that it was his normal practice to give Miranda warnings to a suspected illegal alien who has lied to him, but has no recollection of following his normal practice when he questioned Valentine that evening. (Tr. at 62). Agent Garcia's notes he kept that evening do not indicate he gave Valentine any Miranda warnings. (Tr. at 58). Both Officer Carbonel and Officer Moses testified that they did not give Valentine Miranda warnings at any point on March 16, 2008. (Tr. at 17, 38).

### Discussion

*The Stop of the Vehicle:* The Court does not tarry long on whether the stop of the vehicle Valentine was operating during the early morning hours of March 16, 2008 was constitutional. The record supports any number of legitimate reasons for the stop of the vehicle including: (1) an observed traffic violation committed by the defendant by driving after dark without headlights; (2) a *Terry* stop to investigate the Toyota's quick departure from the Eclipse Nightclub after police learned that a black female was attempting to leave the night-

---

**1.** Immigration and Customs Enforcement     Agency.

club after stabbing a patron, or (3) an arrest of Valentine based on a law enforcement investigation that revealed probable cause that Valentine had knowingly possessed and was using false identification documents. Suffice it so say that I find that law enforcement did not violate Valentine's Fourth Amendment rights when police pulled over the green Toyota 4 Runner he was driving during the early morning hours of March 16, 2008.

*The Interrogation of the Defendant:* The post-stop interrogation of the defendant, however, is more problematic for the government. This is so because the hearing testimony confirms that *Miranda* warnings were never given to Valentine at any point during his March 16th encounter with law enforcement. Law enforcement officers are required to give *Miranda* warnings before questioning a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The admissibility of Valentine's statements to Officer Moses, Officer Carbonel and Agent Garcia depends on whether Valentine's right to warnings required by *Miranda* had attached.[2]

"Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *United States v. Mitchell,* 966 F.2d 92, 98 (2d Cir.1992). Thus, even in the absence of an actual arrest, an individual shall be deemed to be in custody when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to

leave." *United States v. Kirsh,* 54 F.3d 1062, 1067 (2d Cir.1995)(internal quotations and citations omitted), cert. denied, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see United States v. Hall,* 421 F.2d 540, 545 (2d Cir.1969)("[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."). The test for custody is an objective one based on the totality of circumstances surrounding the particular encounter at issue. *See Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Indeed, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*" *Id.* at 440.

The foregoing recapitulation of the legal standard notwithstanding, "courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody" or otherwise deprived of his freedom of movement in any significant way. *Id.* at 441.

Courts have looked at various factors in making this determination. These include: whether a suspect is or is not told that she is free to leave, *see Campaneria v. Reid,* 891 F.2d 1014, 1021 n. 1 (2d Cir.1989); the location and atmosphere of the interrogation, *see Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct.

---

2. The question of "custody" is the disputed issue here. The government does not contest that if the various interviews of Valentine

were custodial, interrogation occurred and incriminating information was obtained.

711, 713–14, 50 L.Ed.2d 714(1977); the language and tone used by the police, *see United States v. Guarno,* 819 F.2d 28, 31–32 (2d Cir.1987); whether the suspect is searched, frisked, or patted down, *see United States v. Wilson,* 901 F.Supp. 172, 175 (S.D.N.Y.1995); and the length of the interrogation, *see Berkemer,* 468 U.S. at 437–38.

*Tankleff v. Senkowski,* 135 F.3d 235, 244 (2d Cir.1998). In *United States v. Newton,* the Second Circuit expanded on the proper test for determining whether an individual is "in custody" for purposes of complying with Miranda. 369 F.3d 659 (2d Cir.2004). The court in *Newton* adopted a two part analysis: (1) the court must determine "whether a reasonable person would have thought he was free to leave," (*id.* at 672); and, if not, (2) "whether his freedom of action has been curtailed to a degree associated with formal arrest" (*id.* at 671 (citations and internal quotation marks omitted)).

After careful review of totality of the circumstances surrounding the events of March 16, 2008, and after consideration of the various indicia of "custody," including, *inter alia,* the factors identified in *Tankleff,* I conclude that Valentine has satisfied both prongs of the *Newton* test.

*A. Free to Leave:* I find that an individual in Valentine's shoes could not have reasonably understood that he was free to leave the back seat of the marked police car when he was being questioned by various local and federal law enforcement officers. First, there is no dispute that Valentine was never told by Moses, Carbonel or Garcia that he was free to leave the vehicle in which he had been placed. "The most obvious and effective means of demonstrating" that a suspect has not been subjected to custodial interrogation "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990). While it is true that Officer Moses and Officer Carbonel's "unarticulated plan"[3] that Valentine was not free to leave the police vehicle is not relevant to the custody analysis, it is also true that their decision not to advise Valentine that he was free to exit the back seat of the police car is also relevant to determining, custody for *Miranda* purposes. *See id.* at 1350 ("[T]he absence of police advisement that the suspect is not under formal arrest, or that the suspect is at liberty to decline to answer questions, has been identified as an important indicium of the existence of a custodial setting."); *United States v. Mitchell,* 966 F.2d 92, 98 (2d Cir.1992)(the custody "inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave").

Second, the location and atmosphere of the interrogation, *Tankleff, supra,* was more consistent with custodial interrogation than "roadside questioning of a motorist detained pursuant to a routine traffic stop." *Berkemer v. McCarty,* 468 U.S. 420, 435, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). A reasonable person in Valentine's situation would quickly discern that his roadside detention was not going to be "temporary and brief" or that he would "most likely be allowed to continue on his way," as is typical of traffic stops. *Id.* at 437. Valentine was told the vehicle was being stopped because the officers were looking for a female suspect in a stabbing at the nightclub he had just left. Valentine's female companion (and presumably the suspect in the stabbing) was allowed to remain in the car, while Valentine was directed by the officers to "step out of the vehicle and walk to the rear of the police

---

3.  *See Berkemer v. McCarty,* 468 U.S. 420, 442,  104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

vehicle." [4] (Tr. at 31–32). While in the car, Valentine was not questioned about the stabbing or any traffic infraction. Rather, Officer Carbonel, who knew at the time of the stop that Valentine was an illegal alien who was involved with forged identification documents and was suspected of drug trafficking, called Agent Garcia to let him know that he had detained Valentine. Agent Garcia, who was also aware of Valentine's status in the United States, specifically directed Carbonel and Moses to interrogate Valentine as to his citizenship. The persistent questioning of Valentine (twice while confined in the back of the police car and once at the PSB) on his citizenship, a subject entirely different than the reason given to Valentine as to why he was being stopped, supports the finding that the atmosphere of Valentine's interrogation was more threatening than that of a routine traffic stop or *Terry* stop. *See Berkemer v. McCarty*, 468 U.S. at 438 n. 27 ("The brevity and spontaneity of an ordinary traffic stop also reduces the danger that the driver through subterfuge will be made to incriminate himself.").

Third, the length of the detention was surely longer than the brief investigatory detention normally associated with either a routine traffic stop or a *Terry* stop. While the government did not elicit proof as to (1) the amount of time defendant spent sitting in his vehicle after the stop, (2) the amount of time the defendant spent in the back seat of the police car while he was questioned by Officer Moses, Officer Carbonel and Agent Garcia, or (3) the time the defendant spent being questioned in the interview room at the PSB, based on the sequence of events adduced during the hearing it certainly exceeded the length of time needed to conduct a routine traffic stop. A reasonable person removed from the vehicle he was driving, frisked for weapons, escorted by the police to the rear of a marked police vehicle where he was directed to sit, and thereafter subjected to repeated questioning (both in the back of the police car and later at the police station) would not "have thought he was free to leave the police encounter." *United States v. Newton*, 369 F.3d at 672.

**B. *Curtailment of Movement:*** The second prong of the *Newton* test is whether Valentine's "freedom of action" was curtailed to a degree associated with formal arrest. Relying on the Supreme Court's decision in *Berkemer*, the Second Circuit found "two factors as particularly relevant to determining whether a lawful investigatory stop involves restraints generally associated with a formal arrest. The first is whether a reasonable person in the suspect's shoes would have understood that his detention was not likely to be temporary and brief. The second is whether a person stopped under the circumstances at issue would feel that he was completely at the mercy of the police." *United States v. Newton*, 369 F.2d at 675 (internal citation and quotations omitted).

---

4. In its post hearing brief, the government argues that Valentine was "asked" to sit in the police car. (*See* Docket # 28 at page 5). At one point Officer Moses agreed with the prosecutor's question that Valentine was "asked" to leave his car. (Tr. at 11). At another point, Moses stated that the defendant was "taken out of the vehicle." (Tr. at 18). Officer Carbonel testified that "[w]e had Mr. Gray [the defendant] step out of the vehicle" and "we had him sit in the rear of the [police] vehicle." (Tr. at 28–29). Later, Carbonel testified: "We had him step out of the vehicle and walk to the rear of the police vehicle." (Tr. at 31–32). Based on the testimony elicited at the hearing, I specifically find that Valentine's movement out of the vehicle and into the back seat of the police vehicle was not voluntary but rather was directed, controlled and required by Officers Moses and Carbonel.

Of course, many of the facts supporting the first prong of the *Newton* test support a finding that the second prong has also been met. A male suspect informed by police that he was stopped by the police to investigate a stabbing where the suspect was a black female, removed from his car and escorted to the back seat of the police car, frisked for weapons, placed in the back of the police car, subjected to repeated questioning about his citizenship while in the back of the police vehicle, transported to the police station and questioned again as to his citizenship would not reasonably conclude that his detention was likely to be "temporary and brief."

Similarly, a reasonable person would also conclude that the police were in complete control of his movements during the encounter and that he was being subjected to arrest like restraints. This was not a meeting in the familiar surroundings of the defendant's home or a situation where the defendant was free to walk around. Under police direction, Valentine was removed from the vehicle he was driving and then frisked before being placed in the back seat of a marked police car. After being questioned repeatedly while seated in the back of the police car, and without his consent or approval, the defendant was driven by the police to the public safety building. Upon arrival at the PSB, the police escorted the defendant to an "interview room," where he was subjected to additional interrogation before finally being told he was under arrest. The complete control of Valentine's movements by law enforcement during the March 16th encounter is consistent with and comparable to the restrictions associated with formal arrest. In sum, Valentine's March 16, 2008 encounter with the police satisfies both prongs of the *Newton* test.

*Pedigree Information:* As an alternative argument, the government contends that

Valentine's statements are not subject to suppression because "the information given consisted of pedigree information." The pedigree exception to *Miranda* is premised on the principle that pedigree information solicited through routine questioning of arrested persons during the booking process does not implicate the protections afforded by *Miranda.* "Routine questions about a suspect's identity and marital status, *ordinarily innocent of any investigative purpose,* do not pose the dangers *Miranda* was designed to check; they are rather the sort of questions normally attendant to arrest and custody." *United States v. Gotchis,* 803 F.2d 74, 79 (2d Cir.1986) (emphasis supplied) (citation and internal quotations omitted).

Relying on Judge Larimer's decision in *United States v. Kadem,* 317 F.Supp.2d 239, 241–43 (W.D.N.Y.2004), the government argues that the police officers and Agent Garcia were simply seeking "basic pedigree information" from Valentine. *Kadem* is distinguishable and indeed supports suppression of the statements at issue here. In *Kadem,* ICE agent Nelson Yera had arranged to interview an inmate housed at the Elmira Correctional Facility. The inmate's name (Abdelkrim Kadem) was listed on a Department of Corrections form ("Report of Alien Person Institutionalized") as an "institutionalized alien" who lived in Brooklyn, New York, but was born in Rome, Italy. The inmate was questioned in an interview room at the prison. Because Kadem was not placed in the interview room voluntarily, Judge Larimer found him to be in custody for *Miranda* purposes and, with one exception, suppressed the incriminating statements the inmate made to the ICE investigator at the prison.

The exception concerned Kadem's response to Agent Yera's initial question asking Kadem to state his name, date and

place of birth. In finding this initial question different from the follow-up questions, Judge Larimer held: "There is no evidence that Yera knew the person that had been brought to the interview room and, therefore, it was entirely reasonable and proper for Yera to attempt to ascertain the name of the man before him and to make sure he was the same person that had been identified in the Report of Person Institutionalized." *United States v. Kadem,* 317 F.Supp. at 241. Judge Larimer found that the purpose of Agent Yera's questions "was not to seek incriminating evidence for criminal prosecution but to simply ascertain the name and identity of the person who might well have issues concerning citizenship." *Id.* at 241–42.

Unlike Abdelkrim Kadem, at the time law enforcement placed Valentine in the back of the police vehicle and began questioning him, the officers knew exactly who he was, what his immigration status was and what other crimes he was suspected of committing. Officer Carbonel testified that at the time they were asking Valentine pedigree information, the officers already knew where Valentine was born and that he was a Jamaican citizen. (Tr. at 47). Indeed, Officer Moses testified he was specifically instructed by Agent Garcia to ask the defendant "a series of questions in regards to his illegalization" in the United States. (Tr. at 10). This was not a chance encounter leading to benign questions about pedigree. Agent Garcia testified that he and Officer Carbonel had spent months working on a joint investigation involving Valentine, they knew Valentine was involved in criminal activity, had targeted him for arrest and in fact were looking for him on March 16, 2008. "[W]e were trying to wait for the right time to arrest him," Carbonel testified. (Tr. at 60–61). Given their prior knowledge of Valentine and his criminal activities, the government's argument that, like Agent

Yera in *Kadem,* the officers here were simply asking routine pedigree questions in order to ascertain the identity of the person they were talking to, is not particularly persuasive. More credible is the notion that once Valentine was placed in the back of the police car, his interrogation was intended to elicit "an incriminating response" that could be used against him in a criminal proceeding. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.").

This was not a situation where "[t]he police meant only to gather ordinary information for administrative purposes." *United States v. Carmona,* 873 F.2d 569, 573 (2d Cir.1989). Officer Carbonel testified that at the time he asked Valentine the pedigree questions, he already knew his alien status and use of false identification documents. (Tr. at 47). Because the officers' questions "were not necessary or attendant to the booking of defendant . . . , and were intended to elicit incriminating information about the defendant's immigration status," the pedigree exception is not applicable. *United States v. Piggott,* No. 93–CR–199S, 1994 WL 228626, at *7 (W.D.N.Y. May 16, 1994) (citation and internal quotations omitted). In sum, I am not persuaded by the government's alternative argument that the protections afforded by *Miranda* were not required because law enforcement was only seeking pedigree information from Valentine. *See Pennsylvania v. Muniz,* 496 U.S. 582, 603 n. 14, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) ("[R]ecognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask

questions, even during booking, that are designed to elicit incriminatory admissions.") (citations and internal quotations omitted).

### Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motions to suppress be **granted.**

**SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson–Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir.1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendant.

**SO ORDERED.**

---

5. Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(f) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days 'allowed for filing objections has elapsed. *United States v. Andress,* 943 F.2d 622 (6th Cir.1991); *United States v. Long,* 900 F.2d 1270 (3th Cir.19–90).